## In re GLENAYRE TECHNOLOGIES, INC. SECURITIES LITIGATION.

### Nos. 96 CIV. 8252(HB), 96 CIV. 9274(HB) and 97 CIV. 1163(HB).

United States District Court,
S.D. New York.

Nov. 4, 1997.

Arthur N. Abbey, Stephen Fearon, Jr., Abbey, Gardey & Squitieri, Stanley Bernstien, Mel Lifshitz, Bernstein Lieghard & Lifshitz, New York, NY, for Plaintiffs.

Gerald Walpin, Rosenman & Colin, New York, NY, Andrew B. Weissman, Arnon Siegel, Wilmer, Cutler & Pickering, Janet Broeckel, Dechert, Price & Rhoads, Wash-

ington, DC, George C. Covington, Kennedy Covington Lobdell & Hickman, Charlotte, NC, for Defendants.

### OPINION AND ORDER

BAER, District Judge.

Defendants move to dismiss these consolidated class action securities cases. Defendants also move to transfer venue to the Western District of North Carolina. For the reasons discussed below, the motions to dismiss are GRANTED, with leave to replead. The motion to transfer is DENIED.

### BACKGROUND

Plaintiffs allege that defendants violated the securities laws by (1) misrepresenting the "firmness" of the company's backlog and (2) failing to disclose the adverse implications of an FCC freeze on licenses for new paging channels. As a result, plaintiffs allege a fraud on the market, which harmed persons who purchased Glenayre stock from February 6, 1996 through September 13, 1996.

Specifically, plaintiffs allege that on February 6–7, 1996 the Company, which among other products is a leading manufacturer of paging technology, announced record results for the prior year and quarter and that various analysts reported the Company's announcement, including the Company's $102 million "firm" backlog. On February 8, the FCC issued a Notice of Proposed Rulemaking that froze new paging license applications (the "Freeze"). Plaintiffs allege that those in the industry, such as Glenayre, were aware of this Freeze before the February 8 FCC announcement and had a duty to disclose its imminence and potential impact. On March 1, 1996 Glenayre filed Comments with the FCC that stated that the Freeze "imposes significant harm on the paging industry" and estimating that Glenayre would lose $10–$12 million in revenue and $2.9–$5.7 million in profit as a result of the Freeze. On March 5, 1996 the company issued a press release describing the potential impact of the FCC Freeze. Its stock price fell 20%.

On March 28, 1996, the company issued its 1995 10–K, touting its year-end "firm" backlog of $102 million. It also noted the FCC's actions and indicated that the Freeze "may"

adversely affect sales. The company continued to issue optimistic statements and very positive results throughout the year. On September 13, 1996 the Company issued a statement saying third quarter income would be 40–45% below the same quarter in the prior year. The next trading day, its stock price dropped from $33 to $20 on heavy trading.

During the class period, the individual defendants sold significant amounts of Glenayre stock. Seven of the eleven individual defendants sold $36 million worth of stock during the month of February 1996—between the time the FCC announced the Freeze and the time Glenayre informed the public of the Freeze's impact. Furthermore, eight of individual defendants also sold additional stock during the year, primarily in May 1996.

### DISCUSSION

### I. Motions to Dismiss

#### A. Fraud

Defendants first allege that plaintiffs have failed to plead facts establishing fraud, as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") of 1995, Pub.L. No. 104–67, 109 Stat. 737. Though plaintiffs identify numerous documents and press releases issued by Glenayre, their only allegations regarding falsity or misrepresentation relate to the company's backlog and the FCC Freeze. With respect to the backlog, there are no allegations that the numbers provided by defendants were inaccurate. Rather, plaintiffs contend solely that defendants represented that the backlog orders were "firm" without identifying the possible contingencies that could lead to fewer orders. In fact, plaintiffs allege, the backlog orders could be cancelled by customers with no penalty. Defendants respond by arguing convincingly that (i) the backlog figures were accurate; (ii) the 10–K indicated that backlog orders "generally" are shipped within six months and there are no allegations in the Complaint that this statement was false when made or ultimately proved to be false; and (iii) there are no allegations that the losses suffered by Glenayre had anything to do with the "infirmity" of the backlog.

■ The allegations regarding the FCC Freeze are a bit more troubling, but plaintiffs' claim ultimately fails here as well. Plaintiffs' argument is that defendants must have known of the pending FCC action prior to their optimistic February 6–7 announcements and prior to their March 1 submission to the FCC. While this may be true, plaintiffs fail to provide any facts to support such a contention. There is no allegation that defendants had greater knowledge of the pending FCC action than anyone else in the industry, and indeed plaintiffs themselves allege that the pending FCC action was widely anticipated in the industry. Such information is thus not subject to mandatory disclosure. *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515–16 (7th Cir.1989) (company need not disclose possible regulatory action known to public); *In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 377 (3d Cir.1993).

Once the FCC made its announcement on February 8, Glenayre filed its comments on March 1 and went public with the substance of those comments on March 5. Plaintiffs fail to allege any facts to support their conclusory allegations that the defendants knew the impact of the Freeze prior to their announcement. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito v. IMCERA Group*, 47 F.3d 47, 53 (2d Cir.1995). Furthermore, defendants had a right to ensure that any announcement regarding the possible impact of the Freeze be accurate and the timing of such an announcement is a matter of business judgment. *Financial Indus. Fund., Inc. v. McDonnell Douglas Corp.*, 474 F.2d 514, 518–19 (10th Cir.1973). The Second Circuit has held similar delays in announcing the adverse impact of agency action to be insufficient to sustain a complaint for securities fraud. *Acito*, 47 F.3d at 51 (one month delay in announcing FDA closing of plant).

Accordingly, plaintiffs have failed to plead fraud with particularity. With respect to the

backlog, they have failed to allege facts indicating a causal link between the alleged infirmity of the "backlog" and any subsequent losses. With respect to the FCC Freeze, they have failed to allege facts showing that defendants had prior knowledge of the Freeze or had any obligation to disclose its possible impact sooner than they did. The Complaint is dismissed, with leave to replead.

**B. Scienter**

**1. The Applicable Standard**

Defendants also argue plaintiffs have failed to plead facts that raise a strong inference of scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Prior to the PSLRA, the Second Circuit allowed a "strong inference" of scienter to be established by facts showing either (i) motive and opportunity to commit fraud or (ii) circumstantial evidence of either (a) reckless or (b) conscious behavior. *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir.1993). In *Norwood Venture Corp. v. Converse, Inc.*, 959 F.Supp. 205 (S.D.N.Y.1997), I held that under the PSLRA a showing of motive and opportunity, without more, no longer suffices to raise a strong inference of scienter. Plaintiffs argue that *Norwood* was wrongly decided and that motive and opportunity suffice to raise a strong inference of scienter even under the PSLRA. Let me take this opportunity to reaffirm and clarify my holding in *Norwood*.

■ I reached my conclusion in *Norwood* based largely on the legislative history of the PSLRA. Specifically, I noted that "Congress sought to 'strengthen existing pleading requirements,' and stated that 'it [did] not intend to codify the Second Circuit's case law interpreting this pleading standard.'" *Norwood*, 959 F.Supp. at 208 (quoting H.R. Conf. Rep. 104–369, 104th Cong., 1st Sess. 41 (1995)).[1] Since *Norwood*, another judge in

---

1. I also relied on *In re Silicon Graphics Sec. Litig.*, No. C 96–0393, 1996 WL 664639 at *7 (N.D.Cal. Sept.25, 1996) in reaching this conclusion. Since *Norwood*, the *Silicon Graphics* court

has reaffirmed its earlier holding, *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 753–57 (N.D.Cal.1997). (*Silicon Graphics II*), concluding that although "[m]otive, opportunity, and

this district has also held that motive an opportunity alone do not suffice to meet the PSLRA's pleading requirement. *In re Baesa Sec. Litig.*, 969 F.Supp. 238 (S.D.N.Y. 1997) (Rakoff, J.). In reaching his conclusion, Judge Rakoff relied on the "plain language of the statute" rather than on legislative history. *Id.* at 242 & n. 2. Regardless of whether the route was legislative history or statutory analysis, both decisions point unmistakably the same direction: the law in this district (unless and until the Circuit says otherwise) is that "motive and opportunity" alone will no longer suffice to meet the required pleading standard. *Compare In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192 (E.D.N.Y.1997) ("motive or opportunity" test survives PSLRA).

■ That "motive and opportunity" no longer automatically suffices to raise a strong inference of scienter does not mean that facts relating to motive and opportunity are not relevant to the scienter analysis. Such facts must be considered—along with other facts pled—in assessing whether a complaint raises a strong inference of knowing misrepresentation.

Judge Rakoff also discussed an additional matter that requires comment. He concluded that a showing of recklessness did suffice to meet the PSLRA's "required state of mind." 15 U.S.C. § 78u–4(b)(2). As noted above, prior to the PSLRA the Circuit allowed a "strong inference" to be established by circumstantial evidence of either reckless or conscious behavior. *Time Warner*, 9 F.3d at 269. In *Norwood*, I concluded that the PSLRA's knowing misrepresentation standard was met when a plaintiff alleged facts indicating conscious behavior by the defendants. *Norwood*, 959 F.Supp. at 208. Al-

though I did not specifically reject the pre-PSLRA recklessness standard, I cited *Friedberg v. Discreet Logic, Inc.*, 959 F.Supp. 42 (D.Mass.1997), for the proposition that the PSLRA did not codify the Second Circuit's motive, opportunity *or recklessness* standard.

■ Referring to *Norwood*, *Friedberg* and *Silicon Graphics*, Judge Rakoff noted that "[w]hile some of the language in these cases suggests that Congress rejected 'recklessness' as sufficient to satisfy the scienter requirement, the cases may also be read as simply reinforcing the requirement that recklessness in this context include a conscious component." *Baesa*, 969 F.Supp. at 241 n. 1.[2] Let me be clear, or perhaps I should say clearer: the statute did not change the substantive law but merely the pleading requirement necessary to survive a motion to dismiss, i.e. that the complaint state facts raising a strong inference of scienter. The required scienter, however, remains the same, and has long been held in this Circuit (and others) to include conscious recklessness. *See Time Warner*, 9 F.3d at 269; *Rolf v. Blyth Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978). I emphasize, however, that recklessness in this context approximates actual intent, and is not merely a heightened form of negligence. *See also Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996).

## 2. The Complaint

■ With this pleading standard in mind, I turn to an examination of the facts alleged in the complaint. The only facts alleged that raise an inference of scienter are the sale of shares by defendants during the month of February. "While *unusual* insider trading

non-deliberate recklessness may provide some evidence of intentional wrongdoing, *[they] are not alone sufficient to support scienter* unless the totality of the evidence creates a strong inference of fraud." *Id.* at 757. *See* discussion below.

**2.** Judge Rakoff's comment that *Norwood* and the other cases cited "substituted a selective reading of the convoluted legislative history for the clear and unambiguous language of the statute" provides at the very least, pause for thought. First, *Norwood* did not rely on the "rich cornucopia" provided by the legislative history in its resolution of the "required state of mind" issue under

the PSLRA. To the contrary, I wrote that "it is instructive to look at the first prong of the Second Circuit's standard"—i.e., the prong relating to circumstantial evidence of reckless or conscious behavior. Further, were the legislative history as "convoluted" as suggested in *Baesa* or the language of the statute—which uses the same "strong inference" language previously adopted by this Circuit—so "unambiguous," one might presume that each court that considered its meaning would have come to the same conclusion. They have not.

activity during the class period may permit an inference of bad faith and scienter," plaintiffs bear the burden of showing that any such sales are in fact unusual. *Acito,* 47 F.3d at 54 (emphasis added); *Duncan v. Pencer,* No. 94 Civ. 0321(LAP), 1996 WL 19043 (S.D.N.Y. Jan.18, 1996). Plaintiffs here point to the high volume of February sales by seven of the eleven individual defendants. As defendants point out, however, such sales were not unusual, as the individual defendants had engaged in such sales in prior months as well, and in fact most sold more stock in 1995 than in 1996.[3] Furthermore, defendants still owned over 3 million shares of Glenayre stock at the end of February, and their sales accounted for only approximately 5% of their holdings.[4] *Compare Acito,* 47 F.3d at 54 (sales of 11% of holdings do not raise inference of scienter); *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill.1997) (scienter cannot be inferred from sale of 6% of holdings). Finally, the Second Circuit has repeatedly noted that "the fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'" *Acito,* 47 F.3d at 54 (citation omitted); *San Leandro Emergency Medical Group Profit Sharing Plan,* 75 F.3d 801, 814 (2d Cir.1996). The February sales, therefore, do not establish the requisite "strong inference" of scienter.[5] Having failed to meet the PSLRA's requirements regarding scienter, the complaint must be, and hereby is, dismissed. Because plaintiffs have articulated a troubling factual scenario, however, leave to replead is granted and plaintiffs may file a

Second Amended Complaint within 45 days of the date of this opinion. Such complaint shall indicate, in bold face type or otherwise, those factual allegations that are different from the Amended Complaint here at issue.[6]

## C. Outside Directors

The Outside Directors also move to dismiss based on the failure to (a) allege facts identifying their role in issuing the alleged misrepresentations, *see Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) (complaint must link fraudulent statements to particular directors) and (b) the failure to allege facts establishing control person liability, *see Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.,* 941 F.Supp. 1369, 1378 (S.D.N.Y.1996) ("Director status alone does not establish control person liability."). Plaintiffs respond by arguing that the defendants can be held liable for the alleged misrepresentations because of their participation in a scheme to defraud and that they need not identify each defendant's specific role before they have had an opportunity to conduct discovery. *See Hallet v. Li & Fung, Ltd.,* No. 95 Civ. 8917(JSM), 1996 WL 487952 at *3–4 (S.D.N.Y. Aug.27, 1996). As for control person liability, plaintiffs argue that such a determination is a question of fact, though they fail to identify what facts alleged would establish such liability (other than the fact that Glenayre has referred to its Board as "active").

In light of the dismissal of the complaint, the Court reserves judgment on these aspects of defendants' motions. Plaintiffs are encouraged, however, to address these concerns in their Amended Complaint.

---

**3.** Plaintiffs' counsel argued at oral argument: "I don't care what they did in '95. I don't care what they did in '94. I don't care what they did in '93." Tr. at 13. Such language, while good rhetoric, ignores plaintiffs' obligation to establish that the February stock sales were unusual. While plaintiffs illustrated that many defendants sold no stock in prior February's, this alone does not establish the February 1996 sales as unusual, as defendants often sold large quantities of stock in one month and none in other months.

**4.** The percentages for individual Outside Directors ranged from 4.9% to 12.4%.

**5.** Plaintiffs' allegations regarding stock sales in the remainder of the class period also do nothing to establish scienter, as most of these sales occurred in May, during the company's profitable second quarter.

**6.** The Court notes that at oral argument that Court asked plaintiffs whether limited discovery, pursuant to 15 U.S.C. § 78u–4(b)(3)(B) (discovery stay may be lifted "to prevent undue prejudice"), would aide plaintiffs in meeting the stringent PSLRA requirements. Rather than accept this offer from the Court, plaintiffs asserted that they believe the Amended Complaint meets the requirements. Tr. at 16–17.

### D. McConnell's Motion to Dismiss for Insufficient Service

Defendant Alma McConnell moves to dismiss the complaint against her for insufficient service of process. Ms. McConnell lives in Canada and plaintiffs initially served her only at Glenayre offices in New York and North Carolina, even though she resigned from the Board in February 1996, long before suit was filed. Plaintiffs do not defend their U.S. service attempts, but contend in their opposition papers that they have since effectuated service in Canada in accordance with Rule 4(f), a fact which McConnell does not dispute. Because Rule 4(m)'s 120–day rule does not apply to foreign service effectuated pursuant to Rule 4(f), the Court holds that service was proper. Nevertheless, the complaint against McConnell is dismissed for the reasons discussed above.

### II. Motion to Transfer Venue

Because leave to replead is granted, the Court addresses defendants' motion to transfer venue to the Western District of North Carolina, where Glenayre's headquarters are located. Defendants concede venue is proper in New York and that 5 of the individual defendants live in New York state. Nevertheless, they argue the case should be transferred because the relevant documents are in North Carolina, the alleged acts occurred there, 25 non-party witnesses from Glenayre reside there, trial in New York would be disruptive to the company and the North Carolina docket is less congested. They also argue that plaintiff's choice of forum is entitled to little deference in class actions. *Cf. Eichenholtz v. Brennan,* 677 F.Supp. 198, 202 (S.D.N.Y.1988) (plaintiff's choice of forum given less deference in derivative suit).

Plaintiffs counter that numerous defendants reside in the New York area, numerous analyst witnesses are from New York and the location of documents is irrelevant in the modern age of copying. While defendants make a sympathetic case for transfer, the Court cannot accept their argument that trial in New York would be exceptionally disruptive to the Company. Depositions of relevant persons can take place in North Carolina, documents can be copied and shipped to New York as easily as to an office in North Carolina and the New York based defendants (and plaintiffs) have a right to have the case litigated in this forum. The motion to transfer is DENIED.

### CONCLUSION

For the reasons discussed above, the motions to dismiss are GRANTED, with leave to replead within 45 days. The motion to transfer is DENIED.

**SO ORDERED.**