David **LEVENTHAL**, Jack Fishbaum, David Stark, Waltzer Diamond FLP, David Wampole, and Hobsen Dewey Beeman on behalf of themselves and all other similarly situated, Plaintiffs,

v.

Leonard **TOW**, Daryl A. Ferguson, Livingston E. Ross, Robert J. DeSantis, J. Michael Love, and Citizens Utilities Company, Defendants.

No. Civ.A.3:97CV01642DJS.

United States District Court, D. Connecticut.

March 31, 1999.

J. Daniel Sagarin, Elias A. Alexiades, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, Keith M. Fleischman, Charles Hellman, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, for Plaintiff David Leventhal.

George Zimmerman, Skadden, Arps, Slate, Meagher & Flom, New York, NY J. Daniel Sagarin, Elias A. Alexiades, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, Keith M. Fleischman, Charles Hellman, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, for Plaintiff Jack Fishbaum.

J. Daniel Sagarin, Elias A. Alexiades, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, Keith M. Fleischman, Charles Hellman, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, for Plaintiffs David Stark, Walter Diamond FLP, David Wampole, Hobson Dewey Beeman.

Shoshanah Victoria Asnis, George Zimmerman, Skadden, Arps, Slate, Meagher & Flom, New York, NY, James F. Stapleton, Jonathan B. Tropp, Day, Berry & Howard, Stamford, CT, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

SQUATRITO, District Judge.

The plaintiffs, stockholders in the Citizens Utilities Company ("Citizens"), brought this class action claiming that the defendants concealed and misrepresented Citizens' financial condition. Specifically, the complaint alleges that Citizens concealed information regarding the value of its assets and the state of its telecommunications expansion, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240. The defendants now move to dismiss the complaint pursuant to FED.R.CIV.P. 12(b)(6) for failure to state a claim upon which relief can be granted, or, alternatively, pursuant to FED.R.CIV.P. 9(b) for failure to plead fraud with particularity. For the reasons set out below, the motion to dismiss is granted in its entirety.

### I. Background

Citizens is a Delaware corporation with its principal place of business in Stamford, Connecticut. Citizens is a diversified communications and public services company that provides, among other things, telecommunications, gas and electric distribution, natural gas transmission and distribution, water distribution and waste water treatment services to customers in twenty states. Citizens Communications, formerly known as Citizens Telecom, is Citizens' telecommunications division. The individual defendants were officers and/or directors of Citizens at all relevant times.

With the passage of the Telecommunications Act of 1996, the telecommunications industry was deregulated. In the newly competitive environment, Citizens embarked upon a plan to expand its services into rural markets and long distance business. This expansion plan is the primary focus of the complaint.

The complaint first alleges that the defendants knew that Citizens' telecommunications rapid expansion into adjacent markets would not succeed because of, among other things, the Company's lack of customer base, brand recognition and infrastructure. Despite this knowledge, the defendants made a series of materially false or misleading statements about Citizens' business, prospects and operations. These material misstatements had the cause and effect of creating in the market an artificially positive assessment of Citizens and its prospects, thus causing the Company's

stock to be overvalued and artificially inflated at all relevant times.

The complaint further alleges that Citizens materially overstated the value of its assets and net worth in violation of the regulatory accounting requirements. It was Citizens' practice to capitalize everything in order to keep costs down and profits high.

The complaint also alleges that the defendants overvalued Citizens stock in order to:

1. engage in insider selling;

2. acquire other companies through stock-for-stock transactions;

3. negotiate pending employment contracts on more favorable terms.

### 1. Facts

In September, 1996 the defendants received an internal memorandum prepared for them entitled "Telecom Sector 1997 Business Strategy Analysis." The report provided that "profit potential over the analysis period is analyzed as being not very good" for Citizens Communications, and that "Citizens Telecom is considered an average enterprise facing a fair number of hurdles in pursuit of market penetration for its services and is analyzed to have poor potential for long term profitability." Am. Compl. § 46. The report also stated, in sections not quoted in the complaint, that Citizens Telecom's management team has "above average experience;" Citizens Telecom has "some abilities to limit competition;" "Citizens Telecom's ability to distribute their services is ... excellent;" "[t]he analysis has determined that Citizens Telecom's management team has very good general experience for this kind of strategy." Asnis Aff.Exh. D at 1, 2, 8.

On September 5, 1996, the beginning of the Class Period, Reuters published a report concerning the Company's expansion and growth plans in which it quoted Citizens Communications' vice president Ronald Spears. The article stated: "Citizens Utilities Co. said Thursday it is aiming to

be among the largest eight or 10 U.S. telephone companies in small but important local telephone markets across the country." Am. Compl. § 29.

On September 30, 1996, during an interview with the Wall Street Transcript, defendant Leonard Tow, the Chairman, the Chief Executive Officer and the Chief Financial Officer of Citizens, discussed the Company's telecommunications business and its expansion plans. Tow stated, among other things:

> Capital is no problem for Citizens Utilities.... I think that Citizens is grossly undervalued in the marketplace.... Citizens is one of the most successful and actively growing members of the club of local exchange carriers.... You know, I don't see any downside in Citizens Utilities. I see nothing but upside, and I see double digit upside far into the future[.]

Id., § 30.

On November 12, 1996, the defendants issued a press release stating that "we fully expect that, absent unforeseen events, Citizens' full year results will reflect earnings and earning per share increases at double-digit rates consistent with analysis consensus." Id., § 31.

In November 1996, the Citizens' Board of Directors received a presentation regarding the Company's telecommunication expansion plans. The complaint is silent as to who prepared the report. At the presentation, the Board was presented with the following information:

> Citizen's Communications' "core business income" had been and would be substantially less than reported income.... The Company would need to begin amortizing certain deferred charges in 1997.... Amortization of balance sheet items [would] impair [Citizens'] income for years ...
>
> \*   \*   \*   \*   \*   \*
>
> The planned business growth required significant "capital and expense invest-

ment in order to build core competencies, infrastructure and distribution."

*Id.* § 47.

On December 17, 1996, Citizens filed a Form S–3 registration statement with the SEC. In that statement, the defendants represented that Citizen's expansion plan was going forward:

Citizens continually considers and is carrying out expansion through acquisitions and joint ventures in the rapidly evolving telecommunications and cable television industries and in traditional public utility and related businesses.

*Id.* § 33.

In January 1997, Daryl A. Ferguson and Spears gave a presentation at an investment conference. Ferguson was the President and Chief Operating Officer of Citizens. On January 16, 1997, Smith Barney Inc. issued a report about the presentation which stated, among other things:

Citizens believes that the passage of the Telecommunications Act has afforded it a window of opportunity to grow its Competitive Local Exchange Business (CLEC) Electric Lightwave (ELI), and its long-distance and local exchange operations, Citizens Telecom. As a result of the combination of good returns from its utility operations; the strong growth potential in its telephone and particularly its [CLEC]; its customer-oriented management and operating structure; and its strong balance sheet, Citizens believes it can growth [sic] at a 14% rate.... In summary, Citizens believes that based on its strong growth potential and a sum-of-the-parts valuation, the stock is worth $15–16 per share.

*Id.* § 34.

On March 17, 1997, Citizens filed a SEC Form 10–K for its year ending December 31, 1996. The Form 10–K provided:

The Company is pursuing an aggressive growth strategy to take advantage of opportunities in the emergency telecommunications marketplace. This strategy includes expansion of the Company's customer base and telecommunications services provided ... The Company's objective in expanding its telecommunications services is to become a full service telecommunications provider offering customers an integrated package of products and services.

*Id.* § 39.

Citizens announced financial results for its fourth quarter and year ending December 31, 1996. Citizens stated that its fourth quarter net income was $47.5 ($0.20 per share) million versus $38.6 million ($0.16 per share) for the fourth quarter of 1995 and $179 million ($0.77 per share) for the full year 1996 versus $159.5 million ($0.69 per share) for the full year 1995. *Id.* § 35.

Citizens published its 1996 Annual Report. The report contained a letter to the shareholders from defendant Tow. That letter stated:

Our strategy of concentrating all of our activities in second- and third-tier markets will insulate us, for the time being, from the intense competition that will be experienced by companies operating in major metropolitan areas, providing us with additional time to secure our markets and hone our offense for successive revolutions of the evolutionary wheel.

*Id.* § 36.

The 1996 Annual Report also contained a letter to shareholders from defendant Ferguson which stated:

The importance of Citizens Communications has grown dramatically over the last six years. The division now generates 70% of Citizens' earnings, up from 58% in 1990, and promises to become an even greater contributor in future years.... Citizens is destined to become one of America's leading telecommunications services providers....

\* \* \* \* \* \*

[W]e have built a very strong company that is unusually well positioned to compete at the cutting edge of our business

and able to take maximum advantage of the extraordinary opportunities before us.

*Id.* § 36.

Analysts in Robert Baird & Co. and NatWest Securities Corp. published "Buy" recommendations for Citizens stock. *Id.* §§ 37–8.

Sometime in April 1997, the defendants acknowledged in an "internal document" that "[b]ig players will be attracted to the few high-volume customers who provide a high-proportion of Citizens' margin," and that "the remaining potential customers in adjacent markets were undesirable [sic]." *Id.* § 50.

On April 8, 1997, vice president of operations for Citizens Communications, Mark Shine, prepared a document assessing the results of the Company's expansion plan. Based on poor January and February 1997 results, the report stated: "January wasn't good. February didn't correct as hoped." *Id.* § 59.

On April 15, 1997, the Company issued a press release announcing the communications services group's name change and a new advertising campaign. Again, the Company heralded its prospects as "one of the nation's fastest-growing, community-based communications providers." *Id.* § 40.

On April 21 and 22, 1997, Citizens held a meeting in Phoenix, Arizona. At that meeting, the defendants began to plan how to disclose to the investing public information concerning the need to scale back the expansion plan and restructure the telecommunications side of the Company. *Id.* § 61.

On April 30, 1997, in a press release, Citizens announced its financial results for its 1997 first quarter ending March 31, 1997. Citizens stated that its first quarter revenues were $372.5 million and net income was $30.2 million, compared to $329.1 million and $38.9 million, respectively, in the same period in the prior year. In the press release, the defendants stated:

"Citizens Communications' revenues grew 20%, with revenues from long distance service and Electric Lightwave increasing 219% and 81%, respectively, in the first quarter.... Increasing communications revenue and revenue opportunities require additional expenses and capital expenditures in 1997 and 1998.... [F]irst-quarter 1997 earnings reflect the impact of increased network, sales, marketing and operational systems support expenses relating to the expansion of Citizens Communications. Earnings will most likely continue to reflect increased and accelerated expenses and capital expenditures during 1997 and 1998 to ensure that Citizens ... is fully prepared for increasing competition. Citizens' Board of Directors and management team believe that the expected long-term benefits of this strategy considerably outweigh any short term impact on 1997 and 1998 earnings and earnings per share, which will likely be below 1996 levels."

*Id.* § 41.

Also on April 30, 1997, Citizens filed SEC Form 10–K for its first quarter of 1997, which stated in relevant part: "[t]his continuing and increasing commitment of capital ... to the Company's aggressive expansion plan ... may result in a future determination that certain of the Company's existing assets are either unrealizable or should have a shorter useful life." Asnis Aff.Exh. A

On May 20, 1997, defendant Spears allegedly acknowledged that as a result of the telecommunications expansion plan, Citizens had been left "CAPITAL STARVED" with "NO INFRASTRUCTURE" and was facing "REGULATORY LOSSES" as well as "POTENTIAL COMPETITIVE LOSSES." Am. Compl. § 60.

On July 11, 1997, the end of the Class Period, Citizens announced that the company would reduce its 1997 capital expenditure program by at least 175 million, take a second quarter 1997 pre-tax charge

of approximately $185 million and restructure so as to reduce expenses by at least $70 million annually. *Id.* § 62.

Also on July 11, 1997, Citizens issued a press release that stated, in relevant part, that its actions were "intended to both improve earnings by year-end 1997 and slow the pace of its telecommunication expansion." More specifically, the press release stated:

> Because of lower than anticipated long distance and adjacent market revenues and the charge to earnings, Citizens' earnings and earnings per share (with and without the charge) for the 1997 second quarter as compared to the prior year quarter will decline more than they did in the first quarter of this year. In order to return to a pattern of increasing earnings in succeeding quarters, it is necessary to substantially reduce operating expenses and capital expenditures.
>
> \* \* \* \* \* \*
>
> The recent Federal Communications Commission order[1] related to access charge reform and the Universal Service Fund subsidies have dictated reconsideration of the Company's rural telephone investment program.

*Id.* § 63; Asnis Aff.Exh. C.

Of the $175 million reduction in capital expenditures, $140 million impacted the communications sector. The $185 million pre-tax charge and the $70 million reduction in annual expenses pertained primarily to the cost of termination of employees, leases, sales and marketing initiatives, as well as the write-off of certain assets, which arose from the curtailment of the long-distance business. Am. Compl. §§ 64–5.

On July 10, the stock closed at $8 7/8; on July 11, after Citizens disclosed their information, the stock closed at $8 11/16.

This figure represents approximately a 2% decline from the close on July 10. The Class period high was $12.18 per share at which Citizens' common stock closed at March 21, 1997. *Id.* § 66; Asnis Aff.Exh. A.

During the period of 9/5/96 – 12/6/96 individual defendants Love, Ross and DeSantis sold their shares of Citizens' stock in total amount of 47,738 shares and proceeds of $560,496.35. Shares were sold for $11.125 to $12.25 per share. Am. Compl. § 74.

During the class period Citizens acquired two corporations through stock-for stock transactions:

1. Conference–Call USA, Inc. on 12/4/96;

2. Odgen Telephone Company on 2/4/97.

The complaint does not reveal the value of the Citizens' stock used in the 'stock for stock' acquisition transactions. *Id.,* § 71.

Defendant Tow's employment contract with Citizens expired in December 1996 and was renegotiated during the class period. *Id.,* § 73.

## II. Standards of Review

### 1. Fed.R.Civ.P. 12(b)(6) Standard of Review

In a civil case, a plaintiff is required to file a short and plain statement to set forth a claim for relief. FED.R.CIV.P. 8(a). On a motion to dismiss for failure to state a claim, "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d

---

1. The press release is referring to an FCC Order that capped the rates applicable to a significant portion of the expansion Citizens was in process of undertaking. FCC Access Charge Reform and Price Cap Performance Review for Local Exchange Carriers (FCC 97–158), 62 Fed.Reg. 31, 868, 40460 (May 7, 1997) (codified at 47 C.F.R. parts 61 and 69 (June 11, 1997)).

80 (1957)). It is not the court's role to weigh the evidence that might be presented at trial; the court must merely determine whether the complaint itself is legally sufficient. *See Goldman,* 754 F.2d at 1067. On a motion to dismiss, all factual allegations of the complaint must be accepted as true. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). Additionally, all reasonable inferences must be made in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

**2. Requirements under Fed.R.Civ.P. 9(b)**

When pleading fraud, Federal Rules of Civil Procedure provide a higher pleading standard than prescribed in FED.R.CIV.P. 8(a). The complaint must meet the requirements of Rule 9(b) of the Federal Rules. Rule 9(b) provides that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

■ The Second Circuit has held that a complaint making allegations of fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). The purpose of Rule 9(b) is to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (citations omitted).

Rule 9(b) applies to claims for securities fraud under Section 10(b) of the Exchange Act. *See In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1545 (9th Cir.1994); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 556 (2d Cir.1979).

**3. Requirements under Exchange Act Section 10(b), Rule 10b–5 and the Private Securities Litigation Reform Act of 1995 ("PSLRA").**

■ In order to state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b–5, a complaint must allege that: (1) the defendant made a false statement or omitted a material fact; (2) the act was made with scienter, and (3) plaintiff's reliance on defendant's action caused plaintiff injury. *See In re Time Warner Inc. Sec. Lit.,* 9 F.3d 259, 264 (2d Cir.1993) (citing *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808 (2d Cir.1996). Pleading the first and third prongs of the requirement usually cause little difficulty, the pleading of scienter however presents a more serious task.

■ The Second Circuit has consistently held that "scienter is a necessary element of every 10b–5 action, and though it need not be plead with great specificity, the facts alleged in the complaint must give rise to a strong inference of fraudulent intent." *O'Brien v. Nat'l Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991) (citing *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990); *see also Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987) (citations omitted) ("Consistent with the language of the Rule, we have recognized that great specificity is not required with respect to ... allegations of ... scienter. The absence of a requirement that scienter be alleged with 'great specificity' is based on the premise that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind") (internal footnote and citation omitted). Prior to the passage of the PSLRA, "a plaintiff [could] establish a strong inference of fraudulent

intent in two ways: 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Chill v. General Electric Company,* 101 F.3d 263, 267 (2d Cir.1996) (*quoting Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)). *See also In re Glenayre Technologies, Inc. Sec. Lit.,* 982 F.Supp. 294, 297 (S.D.N.Y.1997) ("Prior to the PSLRA, the Second Circuit allowed a 'strong inference' of scienter to be established by facts showing either (I) motive and opportunity to commit fraud or (ii) circumstantial evidence of either (a) reckless or (b) conscious behavior") (*citing In re Time Warner, Inc. Sec. Lit.,* 9 F.3d 259, 269 (2d Cir.1993)).

In 1995 the PSLRA was enacted as a reaction to the glut of "strike suits" being brought by aggrieved stockholders. According to the PSLRA, any complaint alleging a violation of Section 10(b) must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1)(B) and (b)(2). District courts in other circuits have held that the strengthened pleading standards of the PSLRA require plaintiffs to plead particularized facts that give rise to a strong inference of knowing misrepresentation on the part of the defendants. *See In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746 (N.D.Cal.1997) ("After a comprehensive review of the legislative history of the SRA, the Court found that the strengthened standard requires plaintiffs to plead particularized facts that give rise to a strong inference of knowing misrepresentation on the part of defendants.... After reviewing the arguments and the legal authorities, the Court believes that its original interpretation was correct").

The PSLRA, therefore, "heightened the requirement for pleading scienter to the level used by the Second Circuit: Plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind.' 15 U.S.C. § 78u–4(b)(2)." *Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 537–38 (2d Cir.1999).

## III. DISCUSSION

The court concludes that the amended complaint fails to satisfy the pleading requirements of Section 10b–5 claims set forth by PSLRA. Specifically, the complaint fails to plead with sufficient particularity facts that give rise to a strong inference of the required scienter. The complaint fails to allege any probative facts giving rise to strong inference that the defendants knew or recklessly disregarded that their statements were materially false, misleading, or that defendants omitted material facts. Finally, the court concludes that the totality of facts, on balance, do not give rise to a strong inference of scienter. Therefore, the complaint must be dismissed for failure to meet the specificity requirements of FED. R.CIV.P. 9(b) and the PSLRA.

### 1. The Complaint Fails to Allege the Requisite Scienter

The plaintiffs argue that the complaint alleges sufficiently probative facts to give rise to a strong inference that the defendants acted with the requisite scienter. Specifically, the plaintiffs argue that the citations from the "internal documents" referenced in the complaint give rise to a strong inference that the defendants knew or recklessly disregarded the risk of making "material misrepresentations" when they: (1) made overly positive statements about the company; and (2) failed to disclose the allegedly negative prospects for the telecommunications expansion plan and the real value of the company's assets.

The court agrees with the defendants that the complaint lacks the particularized facts to support the inference that the defendants acted recklessly or with fraudulent intent. Specifically, the court finds that the complaint contains only conclusory allegations with respect to the defen-

dants' conduct. For example, several statements made by defendants are coupled with the language of Rule 10b–5, creating conclusory allegations that the defendants "had actual knowledge of the misrepresentations . . . or acted with reckless disregard for the truth," "were aware [of] or recklessly disregarded the truth," "knew and/or recklessly disregarded" information rendering their statements false, and "knew and/or recklessly disregarded the falsity and misleading nature of" the statements. *See* Am. Compl. §§ 10, 69, 81. This formulaic pleading technique has been regularly rejected by the Second Circuit. *See Shields*, 25 F.3d at 1129 (concluding that the plaintiff's frequent conclusory allegations that defendants "knew but concealed" material facts, or "knew or were reckless in not knowing" other things do not satisfy the requirements of 9(b)); *Acito*, 47 F.3d at 53 ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud. Moreover, conclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b) . . . and defendants' lack of clairvoyance simply does not constitute securities fraud" (internal citations omitted)); *Rand v. Starter Corp.*, No. 94 CIV. 5325, 1995 WL 322024, at *4 (S.D.N.Y. May 30, 1995) ("[C]onclusory allegations without specific factual support do not give rise to an inference of scienter sufficient to meet the requirements of Rule 9(b). Thus, failure to disclose mismanagement is not actionable absent specific factual allegations").

### A. The Amended Complaint Mischaracterizes Internal Documents and Fails to Identify the Authors and Recipients of the Documents with the Requisite Particularity.

■ The complaint attempts to establish scienter by citing various "internal

memoranda" to (1) establish that the defendants had knowledge that the telecommunications expansion was doomed from the start and (2) belie the optimistic public statements made by the defendants.

The court concludes, however, that the vague, highly selective citations the complaint makes to the supposedly damning "internal documents" are insufficient to raise an inference that the defendants acted with the requisite scienter. The court further concludes that the complaint selectively cites from various other memoranda in order to support the plaintiffs' claims. Consideration of the full text of the memoranda, in particular, the report titled "Telecom Sector 1997 Business Strategy Analysis" reveals a different picture than the one framed in the complaint and undermines the credibility of the claims raised in the complaint.[2] As noted above, the report specifically provided that Citizens Telecom's management team has "above average experience;" Citizens Telecom has "some abilities to limit competition;" "Citizens Telecom's ability to distribute their services is . . . excellent;" "[t]he analysis has determined that Citizens Telecom's management team has very good general experience for this kind of strategy." Asnis Aff.Exh. D at 1, 2, 8. The court concludes that the total mix of information with regard to this report is more fairly characterized as favorable to Citizens' prospects.

### B. The Defendants' Forward Looking Statements Constituted "Puffery".

■ In the present case, as in *Shields*, supra, the complaint presents statements by the defendants predicting success and compares these statements against the backdrop of what actually transpired.

---

**2.** The court may consider the full text of partially quoted materials to decide if the plaintiff could possibly prove its claim. *See In re Hunter Envir. Services Sec. Lit.*, 921 F.Supp. 914 (D.Conn.1996); *Kramer v. Time Warner*

*Inc.*, 937 F.2d 767, 774 (2d Cir.1991); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994); *Pension Benefit Guaranty Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993).

This technique may prove that the defendants were wrong, however, "misguided optimism is not a cause for action." *Shields*, 25 F.3d at 1129. The positive public statements cited by the defendants "lack the sort of definite positive projections that might require later correction." *San Leandro*, 75 F.3d at 811 (citing *Time Warner*, 9 F.3d at 267). "[T]he second circuit has resisted accepting general allegations of scienter that would lead to the presumption of motive for any publicly held corporation that 'desires its stock to be priced highly in the market.'" *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 537–38 (2d Cir.1999) (*quoting Chill v. General Electric Company*, 101 F.3d 263, 267 (2d Cir.1996)).

After a thorough review of the statements presented in the complaint here, the court concludes that Citizens' optimistic public statements were "puffery," that is, they were designed to elicit flattering publicity for promotional purposes, but they were not misleading as to a material fact that would be important to an investor. Finally, the court finds that the defendants' enthusiastic posturing was largely warranted by the company's performance in the last quarter of 1996 and the first quarter of 1997. As noted above, Citizens' fourth quarter net earnings for 1996 were 25% higher than the fourth quarter of 1995. Further, Citizens' first quarter revenues were up over 13%, although net income declined slightly. The court therefore concludes that the allegations presented in the complaint are not actionable under the PSLRA.

### C. Plaintiffs Cannot Use Motive and Opportunity to Establish the Requisite Strong Inference of Scienter.

■ The complaint fails to allege facts that: (1) would give rise to a strong inference of the requisite scienter; or (2) tend to show that the defendants acted with recklessness or actual intent. The court further concludes that the complaint fails to allege "motive and opportunity" sufficient to support a finding of scienter here. Rather, the complaint presents the court with "motives" that have been routinely rejected by courts in this Circuit.

First, the allegation of insider trading is undermined by the fact that only three of the five named individual defendants sold their stock during the class period. More probative, however, is the fact that the two principals of Citizens, the primary alleged wrongdoers, Leonard Tow and Daryl Ferguson, did not sell any stock during the class period. Tow was the Chairman, the Chief Executive Officer and the Chief Financial Officer of Citizens. Ferguson was the President and Chief Operating Officer. Further, another alleged wrongdoer, Ronald Spears, Vice President of Citizens' telecom business, also is not alleged to have sold any Citizens' stock. As the Second Circuit has noted: "[t]he fact that the other defendants did not sell their shares during the relevant class period undermines plaintiff's claim that defendants delayed notifying the public so that they could sell their stock at huge profit." *Acito*, 47 F.3d at 54 (citation omitted). *See also San Leandro*, 75 F.3d at 814.

Moreover, the plaintiffs bear the burden of showing that any such stock sales are unusual. *See Glenayre*, 982 F.Supp. at 299; *Acito*, 47 F.3d at 54. The plaintiffs have made no such showing here. First, any description of the shares of stock sold is of limited probative value without a description of how the shares sold relate to: (1) the seller's total holdings; (2) the total number of outstanding shares; and (3) the effect of the sale on the market price of the securities. Second, defendant DeSantis sold shares worth only $12,487.50. Third, a review of the dates where the stock sales occurred demonstrates that $369,428 of the total $560,496.35 were sold in September and October, 1996. The court therefore finds that over 65% of the alleged irregular sales of stock occurred prior to the first allegedly negative report

presented to the board in November 1996.[3]

The court further concludes that the allegation that the defendants artificially inflated Citizens' stock price in order to "protect and enhance their executive positions" and "negotiate as favorable a deal as possible" on a pending employment contract also fail to give rise to a strong inference of scienter. This motive has been rejected routinely. *See, e.g., Acito,* 47 F.3d at 54 ("If scienter could be [pleaded] on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn.1991) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated ... were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations. It does not logically follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent") *Glickman v. Alexander & Alexander Services, Inc.,* No. 93 Civ. 7594, 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996) (defendant's desire to raise capital is an insufficient allegation of motive.).

■ Finally, the complaint alleges that the defendants had a motive to artificially inflate Citizens' stock price during the class period in order to get more favorable terms in the stock-for-stock transactions and in the issuance of the debentures. Am. Compl. § 32, 71. This motive is also insufficient to establish scienter and is routinely rejected by the courts. The Second Circuit rejected a similar allegation in *San Leandro,* where the plaintiffs attempted to establish motive by alleging that an inflated stock price maintained the company's bond or credit rating at the highest possible level, so as to maximize the marketabil-

ity of a $700 million of debt securities. The court held:

> We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito,* 47 F.3d at 54.

*San Leandro,* 75 F.3d at 814.

Since *San Leandro* the courts of this Circuit have interpreted the decision as an "unequivocal rejection of the concept of motive predicated upon desire to maximize the marketability of debt securities and to minimize interest rates." *In re 1993 Corning Sec. Lit.,* No. 93 CV 7015, 1996 WL 257603, at *6 (S.D.N.Y. May 15, 1996). *See also In re Health Management, Inc. Sec. Lit.,* 970 F.Supp. 192, 203–04 (S.D.N.Y.1997) ("The court ... finds that the second and third motives alleged by the plaintiff, [allowing the company to conclude various acquisitions by using the inflated value of its stock as merger consideration; and obtaining financing on behalf of a company to pursue various business acquisitions], are also insufficient to plead a 'strong inference' of [the company's] motive.").

### 2. *The Defendants Disclosed All Material Facts*

■ Omissions or nondisclosures of the defendants are actionable only if they are material.

The Supreme Court has defined material information (in the proxy context) as information that would have "assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ... The total mix of

---

**3.** As noted above, the September report was largely positive and favorable to Citizens'

business prospects.

information available and the relevant circumstances must be considered. *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538 (2d Cir.1999). Pursuant to § 10(b), information is material "only if its disclosure would alter the 'total mix' of facts available to an investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Ferber v. Travelers Corp.*, 802 F.Supp. 698, 705 (D.Conn.1992) (*citing Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *see also Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 33 (2d Cir.1976) ("[T]he [trial] court held that the correct test was whether the misrepresentations were a substantial factor in Herzfeld's decision to go through with the purchase of the ... securities ... the trial court invoked the appropriate reliance test[;] a plaintiff in a Rule 10b–5 damage action must prove the misrepresentation was a 'substantial factor' in his securities activities.").

The evidence before the court fails to support the claim that the defendants failed to disclose vital information that would have altered the "total mix" of information available to investors. The plaintiff argues that the July 11 disclosure of the reduced expansion plans "stunned the marketplace that, up to that time, had been led to believe that the Company's expansion plans were proceeding as planned and would produce significant long term benefits." Plaintiff's memorandum at 10. This claim is wholly without merit. As noted above, the defendants informed potential investors at the appropriate times that earnings were lower and that the expansion plan was going to be cut back. The court finds that the failure of the stock market to react more dramatically to the July 11, 1998 announcement supports this finding. Finally, within two days of the alleged "stunning" disclosure that Citizens' officers and directors withheld from the public, on July 15, the stock

price recovered and closed ⁷⁄₁₀ of a percent higher than its July 10 close. The court finds that this increase belies the plaintiff claims of a "stunning" negative disclosure of a material nature important to an investment decision.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that the complaint has failed to satisfy the pleading requirements of FED. R.CIV.P. 9(b) and the PSLRA. Accordingly, the defendants' motion to dismiss is GRANTED. (Document number 35). The clerk is directed to close the file.

It is so ordered.