**In re BIO–TECHNOLOGY GENERAL CORP. SECURITIES LITIGATION.**

**Civil Action No. 02–CV–6048(HAA).**

United States District Court,
D. New Jersey.

Aug. 10, 2005.

Olimpio Lee Squitieri, Squitieri & Fearon, LLP, Morristown, NJ, Lionel Z. Glancy, Peter A. Binkow, Robin B. Howard, Robert M. Zabb, Glancy, Binkow & Goldberg, LLP, Los Angeles, CA, Jacob Sabo, Law Offices of Jacob Sabo, Tel Aviv, Israel, for Lead Plaintiff PKN Group.

Roger B. Kaplan, Greenberg Traurig, LLP, Florham Park, NJ, Irwin H. Warren, Miranda S. Schiller, Erin J. Law, Weil, Gotshal & Manges, LLP, New York, NY, for Defendants.

## OPINION AND ORDER

ACKERMAN, Senior District Judge.

This matter comes before the Court on Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint. For the following reasons, Defendants' motion is GRANTED, and the Consolidated Amended Class Action Complaint is DISMISSED WITHOUT PREJUDICE.

## I. BACKGROUND

This case is a purported securities class action brought by investors who purchased shares of Bio–Technology General Corporation ("BTG") between April 19, 1999 and August 2, 2002 (the "Class Period"). BTG, now known as Savient Pharmaceuticals, Inc.,[1] is a New Jersey-based biopharmaceutical company that develops, manufactures, and markets human healthcare products. Its stock is traded on NASDAQ, and, as is required of publicly-traded companies, BTG files quarterly and annual reports with the Securities and Exchange Commission ("SEC").

During fiscal years 1999, 2000, and 2001, Arthur Andersen, L.P. ("Andersen") served as BTG's outside auditor. In this capacity, Andersen reviewed BTG's revenue and earnings data and issued unqualified, or "clean" opinions[2] on BTG's financial statements for those years. The audited financial statements appeared in the annual reports that BTG filed with

the SEC. After Andersen ceased conducting public company audits, BTG retained KPMG as its new outside auditor in May 2002. On August 2, 2002, under KPMG's guidance, BTG publicly warned that a restatement of its financial results for 1999, 2000, and 2001 would be forthcoming.

On September 25, 2002, BTG filed restated year-end and quarterly results for 1999, 2000, and 2001. Nine days later, on Friday, October 4, 2002, KPMG announced that it was resigning as BTG's outside auditor and expressed its opinion that BTG's internal controls were deficient and needed significant strengthening. As a result of these revelations, BTG's common stock fell to $2.10 per share on Monday, October 7, 2002, down from a Class Period high of $20.44.

BTG shareholders quickly responded to these developments by filing the first of several securities class actions on December 20, 2002. Five other securities class actions soon followed. On September 4, 2003, this Court granted a motion to consolidate the six pending actions into the instant action, and appointed Plaintiff PKN Group ("Plaintiff") as lead plaintiff. *See A.F.I.K. Holding SPRL v. Fass*, 216 F.R.D. 567 (D.N.J.2003).

On March 19, 2004, Plaintiff filed a 120-page Consolidated Amended Class Action Complaint (the "Complaint"). The Complaint alleges that BTG and certain of its executive officers[3] (collectively "Defen-

---

**1.** On June 23, 2003, BTG changed its name to Savient Pharmaceuticals, Inc. For simplicity, this Opinion and Order will refer throughout to BTG, the Defendant entity's name during the Class Period.

**2.** "An unqualified opinion, the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles." *In re Worldcom, Inc.*

*Sec. Litig.*, 346 F.Supp.2d 628, 643 n. 17 (S.D.N.Y.2004) (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 n. 13, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984)).

**3.** The executive officers named as defendants are Sim Fass, BTG's Chairman of the Board of Directors and Chief Executive Officer during the Class Period; Yehuda Sternlicht, BTG's Vice President–Finance and Chief Financial Officer from the beginning of the Class Period until June 2001, and thereafter only Vice President–Finance; and John A. Bond, BTG's Senior Vice President–Finance and Treasurer from June 2001 until the end of

dants") violated federal securities laws by disseminating materially false and misleading statements concerning BTG's revenue and earnings, which caused the stock price to become artificially inflated, damaging investors. Specifically, the Complaint charges Defendants with having conducted a two-part scheme to overstate BTG's financial performance and thereby defraud investors during the Class Period. First, Plaintiff contends that BTG and its management knowingly or recklessly engaged in a pattern of accounting fraud that violated Generally Accepted Accounting Principles ("GAAP") and BTG's own internal accounting policies. Plaintiff's contentions in this regard focus on three specific items that BTG improperly reported in its financial statements during the Class Period and that BTG later corrected in its restatements. Second, Plaintiff claims that BTG and its management falsely attributed the source of a sharp increase in sales of its premier drug product, Oxandrin, to the successful penetration of a new therapeutic market, when in fact BTG's management knew that the spike in sales was the result of wholesalers stocking their inventories ahead of an expected Oxandrin price increase. Plaintiff alleges that Defendants' fraudulent accounting practices and false statements regarding sales of Oxandrin violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5, promulgated thereunder. This Opinion will discuss Plaintiff's specific allegations of fraud and misleading statements in greater detail below.

On July 9, 2004, Defendants moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

the Class Period. This Opinion will collectively refer to these executive officers as the

Specifically, Defendants contend that the Complaint fails to plead its allegations with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, and therefore fails to state a claim under Rule 12(b)(6). Under an extended briefing schedule agreed upon by the parties, Plaintiff filed its opposition brief on October 14, 2004, and Defendants filed their reply brief on December 22, 2004.

## II. ANALYSIS

In considering a motion to dismiss for failure to state a claim, a district court must accept all well-pleaded allegations in a complaint as true and view them in a light most favorable to the plaintiff. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997). A district court must confine its inquiry to the complaint, and may not consider allegations set forth in the plaintiff's brief. *Id.* at 1424–25. The court may, however, consider documents incorporated by reference in the complaint. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 205–06 (3d Cir.2002). Dismissal is appropriate only when no relief can be granted under any set of facts that may be proven. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir.2004).

To sustain an action under Section 10(b) and Rule 10b–5, a private plaintiff must plead "(1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir.1996). Federal Rule of Civil Pro-

"Individual Defendants."

cedure 9(b) imposes additional pleading requirements on allegations of fraud or mistake. Rule 9(b) requires a plaintiff alleging violation of Section 10(b) and Rule 10b–5 to plead "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Rockefeller*, 311 F.3d at 216. Stated broadly, Rule 9(b) requires the complaint to set forth "the 'who, what, when, where and how' of the events at issue." *Id.* at 217 (citing *In re Burlington*, 114 F.3d at 1422).

Section 21(D)(b)(1) of the PSLRA, 15 U.S.C. § 78u–4(b)(1) (2000), augments this standard. In securities fraud actions, the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u4(b)(1). The PSLRA additionally provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.; Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004). Echoing the standard of Rule 9(b), the PSLRA requires private securities fraud plaintiffs to plead the details of who was involved in the alleged fraud, where and when the contested events took place, and why any statements made by the defendants were misleading. *In re Rockefeller*, 311 F.3d at 217–18. When a private securities fraud plaintiff fails to meet these heightened standards, the PSLRA directs a trial court to dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

Scienter is a crucial element of any Rule 10b–5 action. Rule 9(b) of the Federal Rules of Civil Procedure explicitly permits generalized averment of a defendant's state of mind. However, the PSLRA superseded this provision as it pertains to private securities fraud actions. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir.2004). Section 21(D)(b)(2) of the PSLRA provides that in private securities fraud actions, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Third Circuit has held that a "strong inference" is established either when the plaintiff alleges facts showing that the defendant had both motive and opportunity to commit fraud, or when the plaintiff alleges facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *GSC Partners*, 368 F.3d at 237.

Together, the heightened pleading requirements of Rule 9(b) and the PSLRA function as a threshold that private securities fraud plaintiffs must surmount before receiving the favorable inferences ordinarily afforded to plaintiffs under Federal Rule of Civil Procedure 12(b)(6). *In re Rockefeller*, 311 F.3d at 224. The PSLRA, in particular, reflects Congress's express intention to " 'substantially heighten' the existing pleading requirements." *Chubb*, 394 F.3d at 145 (quoting *In re Rockefeller*, 311 F.3d at 217). In appropriate circumstances, however, a court may afford some latitude to a plaintiff pleading allegations where the facts supporting those allegations are particularly within the knowledge or control of the defendant. *In re Burlington*, 114 F.3d at 1418. Mindful of these general principles, the Court turns its inquiry to the allegations set forth in Plaintiff's Complaint.

## A. Restated Items

Plaintiff alleges that three items reported in BTG's financial statements during the Class Period and subsequently re-

stated in September 2002 demonstrate that Defendants engaged in a pattern of accounting fraud during the period for which Andersen audited BTG's financial statements. This Opinion will discuss each item in turn.

### 1. Improper Reporting of the DePuy Agreement Fee

Plaintiff first identifies a $5 million contract fee that BTG reported as income in Q2 2000. The contract in question was a license agreement entered into by BTG and DePuy Orthopaedics, Inc. ("DePuy"), a subsidiary of Johnson & Johnson, in June 2000. Under this agreement, BTG granted DePuy an exclusive license to sell its BioHy proprietary product in certain markets over a ten-year period. In return, DuPuy paid BTG a $5 million fee and committed to undertake the necessary clinical trials and submit the necessary applications for regulatory approval of BioHy in all licensed markets except Europe, where BTG was already conducting clinical trials. Defendants contend that DePuy paid $5 million in cash to BTG upon execution of the agreement, and the Complaint does not plead otherwise. Plaintiff does allege, however, that the agreement was executed four days before the end of Q2 2000. BTG reported the entire amount of the payment as income earned in Q2 2000, ostensibly because it had regarded the payment as a performance "milestone." Subsequently, at KPMG's recommendation, BTG restated the DePuy payment by amortizing it over the ten-year life of the agreement. As a result of this restatement, BTG's reported revenues for FY 2000 were reduced by $4.687 million.

Plaintiff alleges that Defendants violated SEC Staff Accounting Bulletin ("SAB") 101 and BTG's own stated accounting policies by reporting the full amount of the DePuy payment as income earned in Q2 2000. SAB 101 provides an SEC staff interpretation of applicable GAAP relating to revenue recognition and calls for deferral of revenue unless an up-front fee, such as the DePuy payment, is received "in exchange for products or services performed that represent the culmination of a separate earnings process." (Compl. ¶ 45.) Plaintiff contends that no "culmination of a separate earnings process" could have been, nor was, achieved in the first four days of a ten-year license agreement such that the entire $5 million payment was properly recorded as income earned in Q2 2000. Thus, Plaintiff posits that Defendants "either falsely claimed a milestone was achieved when in fact none had been or they contrived a 'milestone' for the purpose of wrongfully recognizing revenue." (Id. ¶ 11(1).)

SAB 101 was to be effective December 3, 1999. Two subsequent bulletins, SABs 101A and 101B, delayed full implementation of SAB 101. Plaintiff contends that BTG nevertheless announced that it was adopting SAB 101 as of January 1, 2000. At the same time, BTG announced that it would review its then-existing long-term contracts to amortize revenues that it has previously recognized in earlier years.

Defendants' primary basis for seeking dismissal of the Complaint in regard to the DePuy allegations is that Plaintiff has failed to plead scienter. In support of their argument, Defendants point to the following asserted facts: (1) DePuy paid the $5 million fee to BTG at the time the agreement was executed in June 2000; (2) the fee was non-refundable; (3) BTG characterized the fee as a completed milestone payment and reported it as income earned when received; (4) Andersen gave a clean opinion of BTG's reporting; (5) KPMG later disagreed with Andersen's interpretation of SAB 101 and recommended that BTG restate these revenues; and (6) BTG complied with KPMG's recommendation. Thus, Defendants characterize the DePuy

restatement as "nothing more than a disagreement between Andersen and its successor, KPMG, over the application of an accounting rule, SAB 101." (Defs.' Br. at 22.)

As noted earlier, this Circuit recognizes two alternative standards by which a private securities fraud plaintiff may establish a strong inference that a defendant acted with the required state of mind: either the plaintiff must allege facts demonstrating that the defendant had both motive and opportunity to commit fraud, or the plaintiff must allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *GSC Partners*, 368 F.3d at 237. Accordingly, the Court must weigh Plaintiff's allegations against each of these standards.

### a. Motive and opportunity to commit fraud

Allegations of motive and opportunity satisfy the PSLRA's pleading requirements for scienter only if supported by "facts stated 'with particularity' that give rise to a 'strong inference' of scienter." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 149 (3d Cir.2004) (some internal quotation marks omitted) (quoting 15 U.S.C. § 78u–4(b)(2)). "Blanket assertions of motive and opportunity" and "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme" are insufficient to establish a strong inference of scienter. *GSC Partners*, 368 F.3d at 237. Likewise, generalized motives that would be possessed by most corporate directors or officers do not establish scienter. *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001)). A plaintiff seeking to establish scienter through motive and opportunity must allege "a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* (quoting *Kalnit*, 264 F.3d at 139).

Plaintiff raises three allegations that purportedly establish Defendants' "clear motive" to misreport the DePuy license fee as income for FY 2000. First, Plaintiff alleges that the portion of the DePuy license fee that BTG improperly reported as income in FY 2000, amounting to $4.687 million, represented 5.5% of BTG's originally reported revenues for the year. (Compl.¶ 48(1).) Second, Plaintiff alleges that the $4.687 million overstatement constituted a large percentage of BTG's originally reported net income of $7.717 million for FY 2000, and that BTG's actual net income in 2000, as later restated, was only $765,000—less than 10% of the originally reported figure.[4] (*Id.* ¶ 48(2).) Such allegations do not, in themselves, establish motive sufficient for creating a strong inference of scienter. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir.1996) (noting, in a case where $350 million in false profits masked an actual loss of $85 million, that allegations of a violation of GAAP or SEC regulations do not in themselves establish scienter).

Plaintiff's third and final allegation of motive concerns BTG's acquisition of Myelos Corporation ("Myelos"), a biopharmaceutical company. On February 22, 2001, BTG announced a definitive agreement to acquire Myelos, and the transaction was finalized on March 19, 2001 following approval by Myelos's shareholders. Plaintiff alleges that Defendants had a strong motive to maximize BTG's share price prior to February 21, 2001, the day on which the Myelos agreement was executed. Of the $35 million acquisition cost,

---

4. Part of the discrepancy between the originally reported and restated figures results from certain research and development costs that BTG originally capitalized but later expensed. This item of BTG's restatement will be discussed below.

approximately $21 million was paid in BTG stock. For this purpose, BTG stock was assigned a value determined by the average closing price of BTG common shares during the 20–trading–day period ending on February 20, 2001. Having thus assigned a value of $8.9564 per share, BTG's board was able to determine the number of BTG shares necessary to provide the $21 million consideration. A higher share valuation would have meant that fewer shares were needed for consideration.

Plaintiff avers that Defendants delayed announcing BTG's Q4 2000 and FY 2000 results until February 22, 2001, the day after the Myelos agreement was executed. In prior years, BTG had announced its results earlier (e.g., February 4, 1999 and February 11, 2000). According to Plaintiff, the inflated results that BTG announced on February 22, 2001 were "not very impressive," but were certainly better than the "disastrous actual figures" that came to light in BTG's restatements. (Compl.¶ 4(1).) Plaintiff alleges that if Defendants had announced BTG's actual results for 2000 prior to February 21, 2001, Myelos executives would not have agreed to the acquisition or would have demanded a different exchange ratio; alternatively, if Defendants had announced BTG's actual results on February 22, 2001, BTG's share price would have declined sharply and Myelos shareholders likely would not have approved the transaction at the $8.9564 valuation for BTG common shares. From these allegations, Plaintiff urges the Court to infer that Defendants had a clear motive to misreport the DePuy agreement fee.

As a matter of law, Plaintiff's allegations of motive based on the Myelos acquisition are insufficient to create a strong inference of scienter. Plaintiff's argument assumes that Defendants had the Myelos acquisition in mind when they reported the DePuy agreement fee in Q2 2000. Yet, nowhere does Plaintiff allege that the Myelos acquisition was pending or contemplated in Q2 2000, an allegation that the Court views as essential to any attribution of motive. *See In re Digital Island Sec. Litig.,* 357 F.3d 322, 330–31 (3d Cir.2004) (holding that an assumption devoid of factual allegation does not suffice to create a strong inference of motive). Indeed, the Myelos acquisition occurred more than six months after BTG recognized the DePuy agreement fee as income earned in Q2 2000. The Myelos acquisition cannot serve as evidence of Defendants' motive to misrepresent income in Q2 2000 if Defendants did not anticipate that their misrepresentation could later be advantageous to such an acquisition. *See In re K-tel Int'l., Inc. Sec. Litig.,* 300 F.3d 881, 895 (8th Cir.2002) (finding no intent to defraud in absence of allegation that defendants' GAAP violations in June 1998 evinced expectation that they would be receiving NASD delisting letter in October 1998).

Furthermore, even if Defendants had intended to boost BTG share price in advance of the Myelos acquisition, Plaintiff does not adequately aver why Defendants waited until two days *after* the valuation period closed to announce BTG's artificially inflated results. Indeed, this fact would seem to be at odds with any inference of nefarious motive on the part of Defendants. *See In re Digital Island,* 357 F.3d at 330 (rejecting plaintiff's weak inference of motive because a more compelling interpretation of the facts was that defendants had acted lawfully); *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (6th Cir.2001) (en banc) ("[T]he 'strong inference' requirement means that plaintiffs are entitled only to the most plausible of competing inferences."). Nor does Plaintiff allege any basis for Defendants to be concerned in June 2000 that BTG's full-year financial results would be viewed as problematic by Myelos's board or shareholders. There is likewise no allegation that any of the Indi-

vidual Defendants received "a concrete and personal benefit" from the alleged fraud. *See GSC Partners*, 368 F.3d at 237.

Thus, absent additional, particularized allegations to explain these apparent discrepancies and connect Defendants' reporting of the DePuy agreement fee with the Myelos acquisition, Plaintiff's contentions of motive amount to nothing more than a generalized allegation that Defendants sought to boost BTG's share price. Allegations of a general desire to increase stock price could be made against virtually any director or officer, and therefore do not suffice to create an inference of motive. *See id.* at 238; *see also In re Digital Island*, 357 F.3d at 330 (holding that allegation that directors of target company took measures to artificially suppress share price to ensure that tender offer would not be withdrawn created only a weak inference of motive under the PSLRA); *Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D.Conn.1999) (holding that an allegation that defendants artificially inflated a corporation's stock price to enhance their position in employment contract negotiations did not create a strong inference of scienter). Accordingly, the Court finds that Plaintiff's allegations of motive pertaining to BTG's reporting of the DePuy agreement fee do not establish a strong inference of scienter.

### b. Circumstantial evidence of scienter

■ An alternative means by which a private securities fraud plaintiff may establish a strong inference of scienter is by alleging specific facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners*, 368 F.3d at 237 (quoting *In re Burlington*, 114 F.3d at 1418). Where a plaintiff resorts to pleading circumstantial evidence, however, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. This

Circuit has held that recklessness satisfies the scienter requirement of a Rule 10b–5 action. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir.1999). A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation omitted).

■ Plaintiff alleges that a number of circumstances surrounding BTG's Q2 2000 recognition of the $5 million DePuy agreement fee demonstrate that Defendants acted with scienter. Notably, however, Plaintiff's allegations attribute knowledge of the content of BTG's financial reporting to "Defendants" collectively, without pleading the particulars of such knowledge. (*See* Compl. ¶¶ 46, 47.) The Complaint avers broadly that each of the Individual Defendants, "by virtue of his high-level position with the Company" (*id.* ¶ 26) or "[b]ecause of their Board memberships and/or executive and managerial positions with BTG" (*id.* ¶ 27) or "because of their positions of control and authority" (*id.* ¶ 30), participated in the preparation of BTG's financial statements or should have known the true condition of BTG's business. Plaintiff contends that defendants Fass, Sternlicht, and Bond "are liable for the false statements pleaded herein, as those statements were 'group-published' information." (*Id.* ¶ 25.)

Group pleading protocol developed in the 1980s as a judicial response to the difficulty that securities fraud plaintiffs often faced in attributing authorship for specific corporate announcements. *See, e.g., Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). Under this protocol, a securities fraud plaintiff could name corporate officers as

individual defendants without pleading the particulars of the defendants' respective participation in the preparation and dissemination of corporate statements. *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,* 142 F.Supp.2d 589, 619 (D.N.J. 2001) (quoting *In re Aetna Sec. Litig.,* 34 F.Supp.2d 935, 949 (E.D.Pa.1999)). With the enactment of the PSLRA, however, numerous courts have held that group pleading does not satisfy the strictures of the PSLRA's pleading requirements. *See, e.g., Southland Sec. Corp. v. Inspire Ins. Solutions Inc.,* 365 F.3d 353, 364–65 (5th Cir.2004) (holding that the group pleading doctrine did not survive the PSLRA's enactment); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350–51 (S.D.Cal.1998) (noting that group pleading cannot be reconciled with the PSLRA).

The Third Circuit has not expressly determined whether group pleading has survived enactment of the PSLRA. Nevertheless, the prevailing authority within this District counsels that group pleading has been abolished. *See, e.g., Jones v. Intelli–Check, Inc.,* 274 F.Supp.2d 615, 646 (D.N.J. 2003) (holding that the PSLRA has rendered group pleading unavailable to securities fraud plaintiffs); *P. Schoenfeld,* 142 F.Supp.2d at 619–21 (same); *see also Marra v. Tel–Save Holdings, Inc.,* 1999 WL 317103, at *5 (E.D.Pa. May 18,1999) (holding that group pleading is inconsistent with the PSLRA's heightened pleading standards); *In re Home Health Corp. of Am., Inc. Sec. Litig.,* 1999 WL 79057, at *21 (E.D.Pa. Jan.29, 1999) (same). Furthermore, in what is perhaps the best indication to date of how it will decide the question, the Third Circuit has stated that "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." *In re Advanta,* 180 F.3d at 539 (discussing the PSLRA's heightened pleading requirements in the context of allegations that defendants must have known of alleged

fraud by virtue of their positions within the company). Accordingly, this Court concludes that the PSLRA has abolished group pleading, and that allegations premised solely on group pleading fail to create a strong inference of scienter.

■ While acknowledging that a mere assertion "that defendants approved or helped prepare public disclosures is insufficient to establish knowledge of all aspects of the company's business," at least one court in this District has held that "knowledge may be imputed to individual defendants when the disclosures involve the company's core business." *In re Campbell Soup Co. Sec. Litig.,* 145 F.Supp.2d 574, 599 (D.N.J.2001). In light of strong indications that group pleading has been abolished, however, this Court agrees with the court in *P. Schoenfeld* that imputation of scienter should be sharply limited to instances where the Complaint alleges that "*a specific corporate policy* . . . required a particular officer to be responsible for certain information." *P. Schoenfeld,* 142 F.Supp.2d at 620 (emphasis in original). Where the complaint fails to allege why a defendant's position necessarily entails a particular duty or why a specific corporate policy requires the defendant to have responsibility for particular press releases or SEC filings, allegations concerning group-published information should be rejected for failing to plead scienter with particularity. *Id.* at 620–21.

In the absence of group pleading, Plaintiff's allegations concerning the DePuy agreement fee fail as a matter of law to create a strong inference of scienter as to the Individual Defendants. The Complaint merely alleges in conclusory fashion that "defendants acted with scienter in recording the entire DePuy contract fee in Q2 2000." (Compl.¶ 47.) Nowhere does Plaintiff allege whether or how any of the Individual Defendants—Fass, Sternlicht,

or Bond—were involved in the recording or reporting of the DePuy fee. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 199–200 (1st Cir.2005) (declining to find a strong inference of scienter against CEO and CFO for company's improper accounting of contract income because complaint contained no allegations that officers were directly involved in or had knowledge of the falsity). Nor does Plaintiff allege a specific corporate policy that required the Individual Defendants to be involved in the preparation of BTG's SEC filings. The Third Circuit has noted that "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" *In re Advanta*, 180 F.3d at 539 (citing *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir.1998)). Because Plaintiff has alleged no circumstantial evidence that is not premised implicitly on the mere fact that Individual Defendants occupied positions of management within BTG, Plaintiff has failed to create a strong inference of scienter. Accordingly, Defendants' motion to dismiss is granted with respect to allegations concerning the misreporting of the DePuy agreement fee.

### 2. Reversal of the $2 Million Q2 1999 Oxandrin Sale and Q1 2001 Repurchase

In Q2 1999, BTG reported a $2 million sale of Oxandrin to an overseas distributor. Two years later, in Q1 2001, BTG repurchased this Oxandrin from the same distributor. In its 2002 financial restatements, BTG reversed both the 1999 sale and the 2001 repurchase, and also reversed

the $385,000 cost of goods sold reflected in the 1999 financial statements, "because of significant uncertainties concerning the realization of the invoiced amount at the time of sale." (Defs.' Exs. in Supp. of Mot. to Dismiss, Ex. 7 at 6.) Form 10–Q/A for Q2 2002 notes that "[t]he effect of this reversal includes a reduction in cost of product sales of $1,615,000 for the six months ended June 30, 2001." (Compl.¶ 50.)

Plaintiff alleges that these facts demonstrate two separate frauds. First, Plaintiff avers that BTG's sales revenue was overstated by $2 million in 1999. Plaintiff contends that the "significant uncertainties" that caused BTG to reverse this sale existed in 1999, at the time BTG reported the sale. Accordingly, Plaintiff alleges that BTG's 1999 financial statements were false when filed. The second alleged fraud concerns the manner by which BTG reported its 2001 repurchase of the Oxandrin. Plaintiff contends that rather than reducing its Q1 2001 revenues by the amount of the repurchase, as it should have done, BTG instead improperly "hid" the repurchase by including an additional $1,615,-000[5] in the line item for cost of goods sold in Q1 2001. (*Id.* ¶ 55.) This alleged fraud was revealed only when BTG reversed the Oxandrin sale in its 2002 financial restatements, which required that BTG not only restate its financial statements from 1999, but from 2001 as well.

Defendants contend that the Complaint fails to plead facts establishing fraud with respect to the 1999 Oxandrin sale. A prima facie case of fraud in a Rule 10b–5 action requires a plaintiff to plead facts establishing that "(1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2)

---

**5.** This amount represents the $2 million repurchase less the $385,000 cost of goods reported in Q2 1999.

the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury." *Chubb,* 394 F.3d at 143; *see also In re Burlington,* 114 F.3d at 1417. In addition, Plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *In re Burlington,* 114 F.3d at 1417; *GSC Partners,* 368 F.3d at 236–37.

### a. Material misrepresentation or omission

■ Plaintiff insists that any time a company restates its financial results, it necessarily admits that its original statement of results was false and materially misleading. A restatement is not an admission of wrongdoing, although "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas,* 324 F.Supp.2d at 486–87; *cf. In re Ramp Networks, Inc. Sec.,* 201 F.Supp.2d 1051, 1065–66 (N.D.Cal.2002) (holding that restatements constitute some evidence that original statements were materially false if plaintiff also alleges specific facts concerning particular transactions that violated GAAP). Misrepresentations or omissions are material if the misrepresented or omitted information would be important to a reasonable investor in making an investment decision. *In re Burlington,* 114 F.3d at 1425. Materiality is a mixed question of law and fact, and the Third Circuit has cautioned district courts to "decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question." *Semerenko v. Cendant Corp.,* 223 F.3d 165, 178 (3d Cir. 2000).

■ Applying these general principles to the particular allegations of the Complaint, the Court finds that Plaintiff has adequately pled allegations establishing materially false or misleading statements relating to the 1999 Oxandrin sale and 2001 Oxandrin repurchase. Plaintiff has adequately alleged a restatement of the 1999 sale and 2001 repurchase, a fact which in itself establishes the falsity of the original statements for purposes of surviving a motion to dismiss. *See In re Atlas,* 324 F.Supp.2d at 486. In addition, Plaintiff has alleged facts which establish that the reporting of the 1999 sale overstated Q2 1999 product sales by more than 12%. With respect to the Q1 2001 Oxandrin repurchase, Plaintiff has specifically alleged that the decision to increase the Q1 2001 cost of goods sold by $1,615,000, rather than decrease Q1 2001 revenues by the same amount, resulted in an overstatement of BTG's Q1 2001 reported revenues by 5.7%. According to Plaintiff, this method of accounting for the repurchase also artificially inflated Q1 2001 sales of Oxandrin, BTG's premier product, by 10.7%. The Court has little trouble concluding, in light of these allegations, that Plaintiff has adequately pled a materially false or misleading statement. *See Gebhardt v. ConAgra Foods, Inc.,* 335 F.3d 824, 830 (8th Cir. 2003) (reversing district court's finding that a misstatement of earnings amounting to only 0.4% of company's revenues during the relevant period was immaterial as a matter of law).

### b. Scienter

■ Plaintiff has pled a number of allegations purporting to show that Defendants had motive and opportunity to commit fraud with respect to the Oxandrin sale and repurchase. However, generalized allegations of motive and opportunity do not suffice to create a strong inference of scienter unless accompanied by particularized allegations of "a concrete and personal benefit to the individual defendants resulting from the fraud." *GSC Partners,* 368 F.3d at 237 (quoting *Kalnit,* 264 F.3d

at 139). A general desire to increase stock price, to consummate a transaction, or to eliminate competitors is insufficient to create a strong inference of· scienter as a matter of law. *In re Alpharma,* 372 F.3d at 152–53; *GSC Partners,* 368 F.3d at 237–38. Rather, "[s]ufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit,* 264 F.3d at 139 (internal quotation marks omitted). Here, Plaintiff has not alleged that the Individual Defendants personally sought to benefit from their allegedly fraudulent reporting of the 1999 Oxandrin sale and 2001 repurchase. *Cf. Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000) (noting that motive could be adequately pled "when corporate insiders were alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit"). Accordingly, the Court finds that Plaintiff's allegations do not establish a strong inference of scienter through motive or opportunity.

In addition, Plaintiff's reliance on group pleading precludes the Court from finding a strong inference of scienter. Plaintiff's circumstantial evidence of scienter consists solely of general allegations that defendants "artificially inflated" Oxandrin sales, "deliberately hid" the 2001 repurchase, and "knew" that their actions would not arouse investors' and analysts suspicions. (Compl.¶ 57.) Because the Complaint fails to explain how the Individual Defendants knew of or participated in the preparation and dissemination of false statements, the Complaint fails to create a strong inference of scienter. *See P. Schoenfeld,* 142 F.Supp.2d at 620–21. Accordingly, the Court need not consider the elements of reliance and damages to conclude that Defendants' motion to dismiss must be granted with respect to the 1999 Oxandrin sale and 2001 repurchase.

### 3. Improper Capitalization of Oxandrin Manufacturing Expenses

■ The third restated item concerns BTG's reporting of certain research and development expenses relating to Oxandrin. For three years, beginning in 1999, BTG allegedly capitalized certain costs associated with its efforts to establish new manufacturing sources and a new tablet formulation for its Oxandrin product. These costs totaled $3,118,000 for the period 1999 through 2001. On August 2, 2002, BTG announced that KPMG had taken the position that these costs should have been expensed in the periods when they were incurred, rather than capitalized.[6]

---

**6.** The Internal Revenue Code generally permits taxpayers the option either of expensing research and development expenditures, which allows the taxpayer to take a deduction in the period in which the expenditure was made, or of capitalizing such expenditures, which entails amortizing the costs over a period of years. 26 U.S.C. § 174(a) and (b); *see also Boeing Co. v. United States,* 537 U.S. 437, 442–43, 123 S.Ct. 1099, 155 L.Ed.2d 17 (2003) (discussing Section 174 of the Internal Revenue Code). Amortization means that a taxpayer may report a given expenditure in increments over time, rather than reporting the entire expenditure in the current period and taking a current deduction. Because a deduction offsets the gross income that a taxpayer earns in a given period and thus reduces net income, the act of amortizing expenditures over a term of years means that the taxpayer will report a higher net income in the first year. The implication of the Complaint, therefore, is that Defendants' decision to capitalize certain research and development costs had the effect of improperly inflating BTG's reported net income in 1999, 2000, and 2001.

Plaintiff also contends that in 1999, BTG "wrote off $1,894,000 of manufacturing development costs associated with a product under· development, which costs were originally capitalized, when [BTG] terminated research on this product." (Compl.¶ 59(3) (em-

Plaintiff alleges that BTG's stated policy during the Class Period was to expense all research and development costs in the period in which they were incurred. According to Plaintiff, BTG's capitalization of certain research and development costs relating to Oxandrin violated both BTG's stated policy and Financial Accounting Standards Board guidance. Moreover, Plaintiff contends that BTG's restatement of its 1999, 2000, and 2001 year-end financial statements and quarterly financial statements for Q1 and Q2 2002 to expense these costs constituted an admission that BTG had improperly capitalized these costs during the Class Period.

Defendants seek dismissal of the Complaint with respect to these allegations on the ground that it fails to plead scienter. The Complaint does not allege motive and opportunity, but does allege two specific bases for inferring scienter circumstantially. First, the Complaint alleges that in BTG's 1999 Form 10–K, Defendants expressly reported that an increase in research and development expenses in 1999 was due to "the development of a new formulation for one of [BTG's] existing products." (Compl.¶ 60(1).) Plaintiff avers that the unnamed product is Oxandrin, and contends that this statement indicates that Defendants' failure to expense similar costs relating to a new Oxandrin formulation was accompanied by scienter. Second, the Complaint alleges that upon acquiring Myelos, BTG immediately expensed $45,600,000 in costs attributed to in-process research and development projects. The implication of this allegation is that Defendants' willingness to expense other research and development costs evinces scienter in their failure to do so with respect to the Oxandrin costs.

Although a restatement of financial results is probative of scienter, more is needed to support a strong inference of scienter. *See Rocker Mgmt.*, 2005 WL 1366025, at \*8; *In re Atlas*, 324 F.Supp.2d at 488–89. "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim[;] only where such allegations are coupled with evidence of corresponding fraudulent intent, might they suffice." *Nappier v. Pricewaterhouse Coopers LLP*, 227 F.Supp.2d 263, 276 (D.N.J.2002) (quoting *Novak*, 216 F.3d at 309). Here, Plaintiff relies principally on the fact that Oxandrin research and development costs were restated. By way of pleading additional allegations of scienter, Plaintiff points to just two pieces of circumstantial evidence that, under Plaintiff's self-serving interpretation, admit of the possibility that Defendants acted with fraudulent intent. But this is by no means the only, or even the most compelling interpretation. *See In re Digital Island*, 357 F.3d at 330. Simply asserting that Defendants improperly capitalized certain Oxandrin costs in financial statements representing that all research and development costs are treated as expenses does not establish a strong inference of scienter, even when those financial statements are later restated to expense the formerly capitalized costs.

For instance, Plaintiff does not plead that Defendants capitalized Oxandrin costs *in spite of* having concluded that such costs were properly characterized as research and development costs. Nor does Plaintiff plead particularized facts allowing this Court to infer from the nature of the capitalized costs that Defendants' failure to recognize them as research and development costs was severely reckless. Plain-

---

phasis omitted).) BTG restated its financial statements to expense these costs and eliminate the effect of the write-off from BTG's

1999 financial statements. Plaintiff provides no other information about these alleged costs.

tiff notes that in BTG's 1999 Form 10–K, Defendants referred to an increase in research and development expenses due to the development of a new formulation of Oxandrin while simultaneously capitalizing other costs related to the Oxandrin reformulation, and asks the Court to infer from this fact that Defendants acted with scienter. Yet, this would require the Court to assume that the two sets of costs were of an identical nature, or at least, that the capitalized costs were of such a nature that Defendants' failure to recognize them as research and development costs amounted to recklessness. Plaintiff has pled no particularized facts allowing this Court to draw such a conclusion. *See In re Alpharma*, 372 F.3d at 150 (holding that conclusory allegations of scienter do not satisfy heightened pleading requirements for securities fraud complaints); *In re Burlington*, 114 F.3d at 1418 ("Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible.").

Likewise, it is far from self-evident that BTG's expensing of $45,600,000 for in-process research and development projects after the Myelos acquisition is inconsistent with BTG's decision to capitalize certain Oxandrin costs. Once again, Plaintiff has failed to plead particularized facts about the nature of the costs that Defendants chose to capitalize, and why Defendants either did conclude or were reckless for not concluding that these costs properly should be characterized as research and development costs. *See In re Rockefeller*, 311 F.3d at 217 (stating that a securities fraud complaint must plead the " 'who, what, when, where and how' of the events at issue"). By way of example, Plaintiff might have alleged recklessness by pleading facts demonstrating that the relevant guidelines for classifying costs as research and development were of such a simple nature as to cast serious doubt on Defendants' contention that they acted reasonably and in good faith. *See In re MicroStrategy*, 115 F.Supp.2d at 651 (noting that the relative simplicity of the accounting principles involved was a factor in finding scienter). In the absence of such particularized pleading, however, this Court finds that Plaintiff has at best established a weak inference of scienter with respect to Defendants' capitalization of Oxandrin-related costs.

Plaintiff fails to create a strong inference of scienter for the additional reason that the Complaint relies on impermissible group pleading. As discussed previously, conclusory allegations that the Individual Defendants "knew or should have known" that the contested expenditures should have been expensed (Compl.¶ 60) fail as a matter of law to plead scienter with sufficient particularity. Once again, Plaintiff has not alleged how the Individual Defendants were involved in the preparation or dissemination of materially false statements. Accordingly, Defendants' motion to dismiss is granted with respect to the Oxandrin research and development costs.

## B. False and Misleading Statements regarding Oxandrin

■ The balance of the Complaint identifies numerous allegedly false or materially misleading statements that Defendants made, either in press releases or SEC filings, relating to sales of Oxandrin. Oxandrin is a drug used to treat involuntary weight loss in HIV/AIDS patients. In May 2000, BTG announced that it had entered into an agreement with the Ross Products Division of Abbott Laboratories, Inc. ("Ross") whereby Ross would co-market Oxandrin in the so-called long-term care market for wound care and elderly patients. Subsequently, Oxandrin sales experienced a sharp increase, from $9,886,000 in Q4 2000 to $16,692,000 in Q1 2001 and $17,887,000 in Q2 2001. Plaintiff contends that Defendants repeatedly at-

tributed this increase in Oxandrin sales to BTG's successful penetration of the Ross market, and simultaneously represented to investors that the sales increase was accompanied by large percentage increases in written prescriptions. Plaintiff alleges that BTG stock traded higher on these assurances.

According to Plaintiff, the true reason for the increase in Oxandrin sales was not sales in the Ross market, but rather inventory overstocking by wholesalers who anticipated an impending price increase in Oxandrin. Indeed, Plaintiff alleges that monthly and quarterly reports provided to Defendants by Gentiva, BTG's distributor of Oxandrin, clearly showed that total sales to Ross during Q1 and Q2 2001 represented only a negligible fraction of the increase in Oxandrin sales. Wholesalers expected a price increase, Plaintiff avers, because BTG itself informed them that a price increase was imminent, and in fact, actually raised prices in April 2001. Plaintiff contends that Defendants knew that wholesaler overstocking was the true reason for the sales increase but did not disclose this fact to investors until October 8, 2001. The day after this disclosure, BTG's share price fell by 19% from the closing price of two days earlier.

Plaintiff alleges that Defendants omitted other material information from their representations about the increase in Oxandrin sales and written prescriptions. First, Plaintiff contends that Defendants failed to disclose to investors that the average dosages prescribed in the long-term care market were much smaller than those prescribed in the AIDS market, and therefore, a large percentage increase in written prescriptions did not translate to a corresponding increase in Oxandrin sales. Second, Plaintiff contends that the anticipated Oxandrin price increase induced wholesaler overstocking only in Q1 2001. According to Plaintiff, sustained sales of

Oxandrin in Q2 2001 were the result of the contractual arrangement between BTG and Gentiva whereby Gentiva's purchases from BTG equaled the average of Gentiva's sales to wholesalers during the preceding three months. "Thus, because Gentiva's sales to wholesalers dramatically increased in Q1 2001—a one-time occurrence in anticipation of a price increase rather than a permanent increase in their level of Oxandrin purchases—Gentiva's purchases from BTG in Q2 2001 were automatically and artificially inflated by the parties' purchase formula. . . ." (Compl.¶ 17(3).) Third, Plaintiff contends that Defendants knew but failed to disclose that $5.8 million of the $6.8 million Q1 2001 sales increase was attributable to a single bulk purchase of Oxandrin by a distributor named Bindley, rather than to generalized stocking by wholesalers serving the Ross market. Plaintiff alleges that through these omissions, Defendants consciously or recklessly withheld indispensable information from investors, causing them injury, and thereby violating applicable securities laws.

Defendants seek dismissal of the Complaint with regard to these allegations on several grounds. First, Defendants argue that the Complaint fails to plead a false statement about Oxandrin and that any false statements that Defendants may have made were nevertheless immaterial. Second, Defendants argue that the Complaint fails to plead scienter. Third, Defendants posit that any forward-looking statements that Defendants made concerning Oxandrin were protected by the PSLRA's "safe harbor" provision. Finally, Defendants argue generally that various allegations in the Complaint do not satisfy the PSLRA's "information and belief" pleading standard.

### 1. PSLRA's Standard for "Information and Belief" Pleading

The PSLRA provides that when a Rule 10b–5 plaintiff makes allegations on infor-

mation and belief, "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Some courts in this District, as well as courts in other jurisdictions, have interpreted this language to require a securities fraud plaintiff to name its confidential sources. *See, e.g., In re Party City Sec. Litig.*, 147 F.Supp.2d 282, 305–06 (D.N.J.2001); *In re Nice Sys., Ltd. Sec. Litig.*, 135 F.Supp.2d 551, 571 (D.N.J. 2001). The Third Circuit, however, has recently rejected this view. *Chubb*, 394 F.3d at 146–47. There is no general requirement that a securities fraud complaint name confidential sources. *Id.; Novak*, 216 F.3d at 313.

Nevertheless, to survive a motion to dismiss, a Rule 10b–5 complaint must describe each confidential source "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Chubb*, 394 F.3d at 155. Thus, a complaint setting forth information and belief allegations based on information provided by confidential sources must also allege additional facts providing an adequate basis for believing that a defendant's statements were false. *Novak*, 216 F.3d at 314. Where a complaint adequately sets forth such additional facts, either in the form of documentary evidence or a sufficient general description of the basis of the plaintiff's belief, then the complaint need not name confidential sources. *Id.*

Mindful of these principles, the Court rejects any suggestion that Plaintiff's use of confidential witnesses is legally insufficient to satisfy the PSLRA's heightened requirements for information and belief pleading. Rather, sufficiency is determined by a qualitative evaluation of the additional facts Plaintiff has alleged in support of its information and belief allegations. Accordingly, the Court will consider

Plaintiff's use of confidential witnesses in the broader context of whether Plaintiff's general allegations state a claim under the PSLRA.

**2. Material Misrepresentation or Omission**

Defendants contend that the Complaint fails to plead a false statement about Oxandrin. To understand Plaintiff's averment of a false statement, it is necessary to consider the public statements Defendants are alleged to have made over an extended period of time. In a May 2, 2000 press release, and again in a July 20, 2000 press release, defendant Sim Fass predicted that the newly-consummated co-marketing agreement with Ross could begin to yield accelerated growth of Oxandrin sales beginning in Q4 2000. (Compl.¶¶ 167, 168.) On February 22, 2001, Fass reported an increase in Oxandrin prescriptions of 36% compared to December 2000 and 48% compared to January 2000, and stated that this "broader market penetration" was an indication that BTG's co-marketing agreement with Ross was allowing Oxandrin to reach "many more individuals with involuntary weight loss." (*Id.* ¶ 169.) BTG's Form 10–K for 2000, filed on March 30, 2001, stated that "Oxandrin sales have experienced rapid growth in December 2000 and the first quarter of 2001 as a result of the commencement by the Ross Products Division of Abbott Laboratories of the marketing of Oxandrin to the long-term care market." (*Id.* ¶ 170.)

On April 16, 2001, BTG indicated for the first time that the increased Oxandrin sales in Q1 2001 were only "in part" because of the Ross market. (*Id.* ¶ 171.) BTG made similar statements on May 15, 2001 (*id.* ¶ 172), July 23, 2001 (*id.* ¶ 173), and July 24, 2001 (*id.* ¶ 174). The July 24 statement, consisting of BTG's Q2 2001 earnings release, further stated that the

growth in the number of Oxandrin prescriptions was "supplemented by the Ross initiative in the long-term care sector." (*Id.* ¶ 174.)

BTG's Form 10–Q for Q2 2001, filed on August 9, 2001, continued to represent that the Ross market was one of several reasons behind the increased Oxandrin sales, but acknowledged for the first time that "average prescriptions written for the long-term care market involve a lower dose of Oxandrin than the average prescription written for other markets." (*Id.* ¶ 175.) The same filing noted that for several reasons, including "stocking purchases by wholesalers from Gentiva in connection with the launch of Oxandrin into the long-term care market," it was expected that sales of Oxandrin would decline in Q3 and Q4 of 2001.

On October 8, 2001, BTG's Q3 2001 earnings release announced for the first time that in Q1 2001, there had been "stocking at certain wholesalers due to anticipation of a price increase and to anticipation of the launch into the long-term care sector." (*Id.* ¶ 176.) Nine days later, in a Form S–3 filed on October 17, 2001, BTG reiterated that wholesaler stocking in anticipation of a price increase had contributed to Oxandrin sales growth in the first half of 2001, but explicitly stated for the first time that Q1 wholesaler stocking had, by operation of Gentiva's purchasing formula, caused Gentiva to overstock Oxandrin in Q2. (*Id.* ¶ 178.) BTG also stated that "it was not initially apparent to us and Gentiva, our national distributor, that [Q1 2001] wholesaler purchases were significantly greater than what they needed to meet growing end-user demand." (*Id.* ¶ 179.) This wholesaler stocking, the filing opined, partially "reflects an assumption that an Oxandrin price increase would take place in 2001." (*Id.* ¶ 179.) BTG's Form 10–Q for Q3 2001, filed on November 14, 2001, reiterated that wholesaler stocking

was one of several reasons for the increase in Oxandrin sales in the first half of 2001. (*Id.* ¶ 180.)

On February 21, 2002, BTG released its earnings release for Q4 2001 and fiscal year 2001. In this statement, it was revealed that BTG had in fact increased the price of Oxandrin by 4.2% in April 2001. (*Id.* ¶ 181.) Four days later, Defendant Yehuda Sternlicht was quoted in *Globes*, an Israeli business daily, as stating that "[t]he significant drop in the second half is due to a process of inventory accumulation by the wholesalers in the first half that believed there would be a price increase." (*Id.* ¶ 182.) Plaintiff contends that this statement constitutes an admission that the Oxandrin price increase was the sole reason for the increase in Oxandrin sales in Q1 2001. In the same article, Sternlicht went on to state that "[e]ventually the increase occurred, although not at the expected time." (*Id.* ¶ 183.) Plaintiff contends that Sternlicht's representation that a price increase did not occur when wholesalers expected—in the first half of 2001— flatly contradicts BTG's admission just four days earlier that an Oxandrin price increase was effective in April 2001. Finally, Plaintiff alleges that information provided by an individual known only as Confidential Witness 3 ("CW3"), who worked as a BTG salesperson in 2001, corroborates Plaintiff's allegation that Ross sales were in fact negligible. Specifically, CW3 states that of approximately $1 million in wholesaler sales per salesperson per year, Ross sales amounted to only about $50,000.

Having carefully reviewed each of these allegations, the Court finds that Plaintiff has sufficiently pled certain false statements with regard to sales of Oxandrin. First, BTG's Form 10–K for 2000 represented that the growth of Oxandrin sales in Q1 2001 was "as a result of" the Ross

market. Although subsequent statements qualified this representation to varying degrees, Plaintiff's allegations establish that by late 2001, BTG was publicly acknowledging that the Ross market represented at most a small portion of Q1 2001 sales growth. The disparity among BTG's public statements, if proven, is sufficient to establish a material misrepresentation regarding Oxandrin sales. *See Semerenko,* 223 F.3d at 178 (cautioning district courts from deciding materiality as a question of law except where reasonable minds could not differ).

Second, the Complaint sufficiently pleads that Defendants never disclosed that most of the $7 million increase in Q1 2001 Oxandrin sales over Q4 2000 Oxandrin sales consisted of a single $5.8 million purchase by Bindley, an Oxandrin wholesaler. The Complaint alleges that Bindley, as just one of multiple Oxandrin wholesalers, sold an average of less than $1 million of Oxandrin to all retailers in each of the first two quarters of 2001. These sales figures, Plaintiff alleges, belie any inference that Bindley's one-time $5.8 million purchase was "as a result of" the Ross market. The Court finds that the most compelling interpretation of these allegations is that at a time when BTG represented that the Q1 2001 sales increase was "as a result of" or "in large part as a result of" the Ross market, Defendants failed to disclose that a major percentage of the increase was in fact due to a single sale whose relation to the Ross market was at best questionable. Accordingly, the Court finds that the Complaint sufficiently pleads a material omission with respect to the Bindley sale. ·

Third, Plaintiff has sufficiently alleged that BTG misrepresented the source of Q2 2001 Oxandrin sales, or omitted to inform investors of the true reason for elevated Oxandrin sales that quarter. In statements released in July and August 2001, BTG noted the heightened Oxandrin sales experienced in Q2 2001 and suggested several reasons for this growth, including sales in the Ross market. However, it was not until October 17, 2001 that BTG revealed a new reason: Gentiva's overstocking by operation of its contractual purchasing formula. BTG admitted that Gentiva's contractual obligations had compelled it to increase its inventory of Oxandrin "beyond the desired level" in Q2 2001. (Compl.¶ 178.) The Court finds that Defendants' failure to reveal this source of Q2 2001 sales while representing various other reasons for sales growth was a material omission.

Fourth, Plaintiff has adequately pled a material misrepresentation and omission with respect to the Oxandrin price increase. Plaintiff alleges that Defendants did not disclose the April 2001 Oxandrin price increase to investors until February 21, 2002. In October and November 2001, however, earnings releases and SEC filings spoke merely of a wholesaler "assumption" or "anticipation" of a price increase, while acknowledging that such expectations had the effect of increasing Oxandrin sales. These allegations easily allow this Court to find that the Complaint adequately alleges material omissions with respect to Defendants' delay in announcing the Oxandrin price increase, particularly when, in late 2001, BTG was publicly representing that Q1 2001 Oxandrin sales growth was due in part to wholesaler "anticipation" of a price increase. In addition, the Court finds a material misrepresentation in Sternlicht's February 25, 2002 statement, which, under a literal reading, suggests that a price increase did not occur "at the expected time," i.e., in the first half of 2001. This clearly contradicts BTG's earlier statement that a 4.2% increase in the price of Oxandrin had been effective in April 2001.

Finally, Plaintiff has adequately pled a material omission with respect to Oxandrin prescriptions. On February 22, 2001, BTG first commented on the substantial percentage growth of Oxandrin prescriptions as a result of the Ross market. It was allegedly not until August 9, 2001 that BTG revealed that prescriptions in the Ross market involved smaller dosages than were required in traditional markets, thus undercutting the significance of the percentage growth. The Court finds that a reasonable investor would consider this information significant in making his or her investment decision, *In re Burlington,* 114 F.3d at 1425, and concludes that the Complaint therefore adequately pleads a material omission with respect to the percentage increase of Oxandrin prescriptions.

### 3. Scienter

■ The Complaint alleges that BTG collected industry information from which Defendants knew or should have known the truth about Oxandrin sales in Q1 and Q2 2001. (Compl.¶ 164.) Plaintiff alleges that BTG salespeople, including a confidential witness identified as "CW1," collected reports compiling Oxandrin sales data for Q1 and Q2 2001. CW1, a regional salesperson for BTG, allegedly conducted a personal investigation in 2001 to determine why her Oxandrin sales and sales commissions fell in July 2001. BTG allegedly paid Oxandrin sales commissions on the basis of Gentiva's sales to wholesalers, as reflected in monthly reports provided to the BTG sales force by Gentiva and Prometrics Consulting ("Prometrics"), a provider of drug sales data. Through her investigation, CW1 allegedly learned that Oxandrin sales from wholesalers to pharmacies had not fallen. At the same time, the sales reports indicated that Gentiva's sales to a wholesaler named McKesson had fallen relative to McKesson's sales to pharmacies, thus resulting in lower sales commissions to the sales force. CW1 allegedly learned, through records she obtained from McKesson, that McKesson's sales during this period were from inventory, rather than from purchases from Gentiva. Plaintiff contends that CW1 ultimately learned that the source of this inventory was the $5.8 million of Oxandrin that Bindley had purchased in Q1 2001 and had resold to McKesson later in that quarter.

For the proposition that Bindley resold the $5.8 million Oxandrin inventory to McKesson in Q1 2001, Plaintiff relies solely on an e-mail from CW1 to her attorney dated February 22, 2002, and a subsequent letter from CW1's attorney to BTG's Director of Human Resources on March 14, 2002. Plaintiff provides no other documentary evidence of this sale. The Complaint does, however, allege circumstantial evidence of this sale in the form of certain actions taken by BTG in the wake of the Bindley sale. First, because each salesperson was responsible for a particular geographic area, and because the Oxandrin sale to Bindley was not territorially-based, the Complaint alleges that in Q1 2001 BTG, without informing its salespeople, internally accounted for the Bindley sale by allocating it among its entire sales force. Plaintiff has produced documentary evidence of this allocation. (Compl., Ex. A at 26.) Second, in response to salesperson complaints in the fall of 2001 that their Oxandrin commissions were negatively affected by lower sales from Gentiva to McKesson, Plaintiff contends that Defendants, in November 2001, again adjusted BTG's sales figures so as to credit each salesperson with that portion of the $5.8 million Bindley sale which was subsequently resold by McKesson in their respective territories. Plaintiff has again provided documentary evidence of this allocation. (Compl., Ex. A at 27.)

The Court finds that Plaintiff's allegations, based largely on information provided by confidential witnesses, satisfy the PSLRA's standard for information and belief pleading. As noted already, the PSLRA is satisfied if a complaint sets forth "a sufficient general description of the personal sources of the plaintiffs' beliefs." *Novak*, 216 F.3d at 314. In this instance, the Complaint sets forth information provided by several confidential witnesses and supported, at least circumstantially, by documentary evidence. The Complaint describes the confidential witnesses' positions within BTG and avers that these witnesses were regularly provided with the type of detailed sales data that informs Plaintiff's allegations. In short, Plaintiff's allegations are sufficiently particularized "to support the probability that a person in the position occupied by the source would possess the information alleged." *Chubb*, 394 F.3d at 155.

The question remains whether these allegations create a strong inference of scienter as to Defendants. To state a prima facie Rule 10b–5 claim in this Circuit, a plaintiff must allege that the defendants acted with recklessness amounting to "an extreme departure from the standards of ordinary care." *In re Alpharma*, 372 F.3d at 149–50. Furthermore, the plaintiff must allege with particularity that the individual defendants possessed the requisite scienter. *Id.* at 150. Conclusory allegations that the defendants "knew" or "must have known" that their statements were false do not create a strong inference of scienter as a matter of law. *GSC Partners*, 368 F.3d at 239.

### a. Motive and opportunity

■ The Court can quickly dispense with Plaintiff's single allegation that the Myelos acquisition provided motive and opportunity for Defendants to misrepresent Oxandrin sales in Q1 and Q2 2001. As already discussed, the Myelos acquisi-

tion was paid in large part with BTG common shares, which were assigned a value based on the average closing price of the shares during the 20–trading–day period ending on February 20, 2001. Plaintiff alleges that "[D]efendants delayed the release of Q4 2000 and fiscal 2000 operations results until the day the acquisition was announced. Further, they inflated BTG's actual results to ensure that Myelos shareholders approved the acquisition at the proposed exchange rate." (Compl.¶ 232.) This allegation is wholly conclusory and bears no apparent connection with Plaintiff's allegations that Defendants misrepresented Oxandrin sales in Q1 and Q2 2001. Without particularized allegations connecting Defendants statements on Oxandrin sales with the Myelos acquisition, Plaintiff's allegations of motive and opportunity are legally insufficient to create a strong inference of scienter.

### b. Circumstantial evidence of scienter.

■ Plaintiff contends that when Defendants were making material misrepresentations and omissions about Oxandrin sales in Q1 and Q2 2001, Defendants knew the true state of Oxandrin sales because they possessed detailed monthly and quarterly sales reports from Gentiva and Prometrics. Indeed, Plaintiff has pled numerous allegations and provided documentary evidence showing that Prometrics and Gentiva submitted such reports to BTG's sales force on a regular basis. For example, Plaintiff alleges that these reports were regularly submitted to the BTG sales staff (Compl.¶¶ 5, 189(1)-(4), 214, 215, 218), that the reports were "available company-wide" (*id.* ¶ 189(4)), and that the reports were known to certain members of BTG's "upper management," such as Vice President of Sales John Librie (*id.* ¶ 223). Yet nowhere does Plaintiff allege that the reports were known to Defendants Fass,

Sternlicht, or Bond. Apart from numerous conclusory allegations that the Individual Defendants "knew" of the contents of these reports (see, e.g., id. ¶¶ 164, 179, 196, 202, 213, 216, 219, 220, 222, 226, 231, 237), Plaintiff's basis for alleging scienter is that the Individual Defendants "reviewed or should have reviewed" the contents of the Oxandrin sales reports (id. ¶ 17).

Plaintiff's circumstantial evidence fails as a matter of law to create a strong inference of scienter because Plaintiff conspicuously neglects the critical step of connecting the Oxandrin sales reports and the data therein with the named Individual Defendants in this case: Sim Fass, Yehuda Sternlicht, and John Bond. Mere allegations of knowledge on the part of subordinates do not provide a sufficient basis for imputing knowledge to executives. In re Alpharma, 372 F.3d at 150 (citing Kushner v. Beverly Enters., Inc., 317 F.3d 820, 828 (8th Cir.2003)). Nor does a defendant's supervisory role within a corporation diminish a plaintiff's burden to plead allegations of securities fraud with particularity. In re Advanta, 180 F.3d at 539 ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."); In re Suprema Specialities, Inc. Sec. Litig., 334 F.Supp.2d 637, 655 (D.N.J.2004) ("One's position in [a] company is not enough to show knowledge or recklessness."). Nowhere does Plaintiff allege that Defendants Fass, Sternlicht, or Bond ever reviewed the Gentiva and Prometrics sales reports, much less that they did so during the period in which they were making materially misleading statements about Oxandrin sales to the public. The mere fact that Oxandrin sales data were sent to BTG's sales force and were ultimately available for review by the Individual Defendants does not give rise to a strong inference of scienter. In re Alpharma, 372 F.3d at 151.

Moreover, even if this Court were to interpret the Complaint as alleging that the Individual Defendants were reckless in not reviewing the Oxandrin sales reports, Plaintiff still falls short of establishing a strong inference of scienter. Recklessness contemplates "a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." In re Digital Island, 357 F.3d at 332 (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir.1979)). The purpose of allowing a securities plaintiff to plead recklessness is to deter deliberate ignorance, not to provide a vehicle for claims grounded in corporate mismanagement. Id. As Defendants note in their brief, allegations that the Individual Defendants should have personally reviewed the reports provided to BTG's sales force allege, at most, an error of judgment, not intent to defraud. (Defs.' Br. in Supp. of Mot. to Dismiss at 25.) Accordingly, the Court finds that Plaintiff's circumstantial evidence fails to create a strong inference of scienter. See In re Galileo Corp. S'holders Litig., 127 F.Supp.2d 251, 264–65 (D.Mass.2001) (declining to find a strong inference of scienter in plaintiff's allegations that management defendants had access to publicly-available sales information that contradicted defendants' statements).

Furthermore, in the absence of any allegation of a specific corporate policy requiring the Individual Defendants to be involved in reviewing Oxandrin sales data, the Court is not prepared to impute detailed knowledge of BTG's monthly and quarterly Oxandrin sales data. First, as Defendants note in their brief, a number of the Oxandrin sales reports are "barely comprehensible" lists of data which offer no indication of whether or when senior management would have learned of their contents. (Defs.' Br. in Supp. of Mot. to Dismiss at 25–26 n. 7.) Second, although it

is true that Oxandrin is BTG's premier product, this fact alone does not warrant imputing to the Individual Defendants knowledge of subtleties discernable only through detailed study of monthly and quarterly Oxandrin sales data. *See In re Campbell Soup,* 145 F.Supp.2d at 599 (noting the importance of allegations that individual defendants had access to and received information about questionable sales and accounting practices).

It would be a relatively simple matter for Plaintiff to plead circumstantial evidence of the Individual Defendants' knowledge of the Oxandrin sales data. For instance, Plaintiff could have pled circumstantial evidence of scienter by showing that BTG had a specific policy requiring the Individual Defendants to review Oxandrin sales reports in the periods in which they were provided to BTG's sales staff. Plaintiff might also have pled that the BTG had a policy whereby the sales staff would routinely summarize the Oxandrin sales data and deliver the summaries to the Individual Defendants for review. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1231, 1234 (9th Cir.2004) (finding strong inference of scienter based in part on allegations that top management closely monitored real-time sales database and had a "detail-oriented" management style). Instead, Plaintiff relies on the legal fiction of imputing knowledge as the means of tying the Individual Defendants' mental states to the otherwise adequately pled pattern of material misstatements concerning Oxandrin. Under these circumstances, the Court finds that Plaintiff has failed to create a strong inference of scienter.

#### 4. Safe Harbor

Because this Court has concluded that Plaintiff has failed to create a strong inference of scienter with respect to BTG's statements concerning Oxandrin, the Court need not address the applicability of the PSLRA's safe harbor provision for forward-looking statements.

### C. Section 20(a) Control–Person Liability

Count II of the Complaint seeks to hold Defendants secondarily liable as "control persons" under Section 20(a) of the Exchange Act. Control-person liability under Section 20(a) must be predicated upon an independent, primary violation of the Exchange Act or any rules and regulations promulgated thereunder. 15 U.S.C. § 78t–1(a). Thus, where there is no primary violation of the Exchange Act, there may can be no violation of Section 20(a). *In re Alpharma,* 372 F.3d at 153 ("If no controlled person is liable, there can be no controlling person liability.") (quoting *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 279 (3d Cir.1992)). Because Plaintiff has failed to plead sufficiently a violation of Section 10(b) or Rule 10b–5, Defendants' motion to dismiss the Section 20(b) claim must be granted. *See In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d 425, 474 (D.N.J. 2000).

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is hereby GRANTED. Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Section 21D(b)(3)(A) of the PSLRA, 15 U.S.C. § 78u–4(b)(3)(A), the Court hereby DISMISSES Plaintiff's Consolidated Amended Class Action Complaint WITHOUT PREJUDICE. Plaintiff shall have thirty (30) days from the date of entry of this Order to file a second consolidated amended class action complaint.